PER CURIAM.
Riley Wilson worked as an admissions representative for Career Education Corporation (CEC), recruiting students to enroll in CEC’s culinary arts college. Until February 2011, Wilson and his fellow admissions * representatives worked under a contract (called the Plan) that gave them a bonus for each student they recruited, above a definite threshold, who either completed a full course or a year of study. In October 2010, however, the U.S. Department of Education (ED) issued regulations prohibiting this kind of arrangement; its new rules were scheduled to take effect in July 2011. CEC decided in effect to advance the effective date to February 2011, and pursuant to that decision, it announced to its admissions representatives that it would cease paying bonuses at the end of February 2011. It further stated that no bonuses would be regarded as earned by that date unless the student in question had completed the year of study or course by that time. Wilson sued, asserting that *669 CEC owed him bonuses for his “pipeline” students—that is, those whom he had recruited and who were on target to complete a full course or year of study between March and June 2011. The district court found that he had failed to state a claim upon which relief could be granted and thus dismissed the action. See Fed. R.Civ.P. 12(b)(6).
On appeal, Wilson presents several grounds for reversal: (1) he argues that CEC breached its contract with him and his fellow admissions representatives; (2) he argues that CEC was unjustly enriched by his efforts to enroll qualifying students and that it should be required to disgorge the bonuses that it wrongfully withheld; and (3) he argues that CEC violated the implied covenant of good faith and fair dealing—implicit in the contract—when it terminated the agreement.
I
We begin by setting forth the factual and procedural background of the case in more detail. Although Wilson had worked for CEC since October 2008, his claim in this case concerns only students that he enrolled during the second and third quarters of 2010. The Plan in effect during 2010 provided that a representative did not earn a bonus until the student in question had completed one year or a full course of study:
For a particular student to be counted towards supplemental compensation for an admissions representative, the student must successfully complete either his/her academic program, or one academic year of his/her program, whichever is shorter, within the applicable evaluation period as defined below. The admissions representative will earn supplemental compensation of $400 for each such student beyond the thresholds specified in the representative’s Minimum Performance Goals for number of graduates or number of students who complete one academic year of their program (“MPG Threshold”).
For example, for students an admissions representative is on record for enrolling who start their academic program at any time during the first quarter of 2010, the admissions representative will earn supplemental compensation of $400 for each such student above the employee’s MPG Threshold who successfully completes his/her academic program, or one academic year of his/her academic program, whichever is shorter, during the evaluation period that extends from October 1, 2010 through June 30, 2011.
The Plan also explained that if employment was terminated on any given day, the employee would be entitled only to bonuses for students who had completed a year or a full course of study before that day, and not for students “in the pipeline”:
An employee is considered to have “earned” supplemental compensation under this Plan for the evaluation period during which his/her employment ends if, as of the employee’s termination date, the employee has exceeded his/her MPG Threshold for that evaluation period for students who have successfully completed either their academic program or one academic year of their program. The employee will only be entitled to supplemental compensation ... based on those students who have successfully completed their academic program or one academic year of their program, whichever is shorter, as of the employee’s termination date, and not for any students who successfully complete their academic program or one academic year of their program after the employee’s termination date.
*670 Finally, the Plan reserved CEC’s right to terminate the Plan itself at any time, for any reason:
If CEC determines at any time that this Plan should be modified due to the requirements or standards of the U.S. Department of Education or any state agency or accrediting commission, then CEC may be obligated to modify this Plan. CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reason that CEC determines, in its sole discretion. Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion.
Before February 2011, CEC paid Wilson the bonuses to which he was entitled under the Plan. During the third quarter of 2009, Wilson enrolled 23 students, eight above the MPG threshold of 15 students for that period. In the second quarter of 2010, those eight extra students completed a full course or year of study, and at that point CEC paid Wilson $3,200 in bonuses ($400 x 8).
Unfortunately for Wilson and his fellow representatives, the ED released its new regulations in October 2010, and the representatives learned that effective July 2011 educational institutions participating in Title IV federal student financial aid programs would no longer be permitted to “provide any commission, bonus, or incentive payment based in any part, directly or indirectly, on success in securing enrollments.” 75 Fed.Reg. 66832, 66950 (October 29, 2010) (amending 34 C.F.R. § 668.14(b)(22)). An ED press release explained that the new regulations were geared toward “protecting students from aggressive or misleading recruiting practices, providing consumers with better information about the effectiveness of career college and training programs, and ensuring that only eligible students or programs receive aid.” Press Release, U.S. Department of Education, Department of Education Establishes New Student Aid Rules to Protect Borrowers and Taxpayers (October 28, 2010), available at http://www.ed. gov/news/press-releases/department-education-establishes-newstudent-aid-rules-protect-borrowers-and-tax (last visited August 29, 2013).
In December 2010, CEC circulated a memorandum to its representatives announcing that, in order to comply with the new regulations, it would pay representatives bonuses that they earned as of February 28, 2011, and discontinue the Plan thereafter. Wilson had recruited 11 students who began in the second quarter of 2010, three students above the MPG threshold for that quarter, and he recruited 34 students who enrolled in the third quarter of 2010, 21 students above the MPG threshold for that quarter. Wilson stood to earn $9,600 ($400 x 24) if all of those extra students completed their full program or one year of study. At the time the program was terminated on February 28, 2011, however, only one of the 24 extra students had completed either the full program or one year, and therefore CEC paid Wilson only $400 as a bonus.
Wilson then brought this putative class action against CEC on behalf of all admissions representatives in his situation. He asserted that CEC breached the terms of the Plan because, in his view, the representatives had “substantially performed” the work that entitled them to bonus payments once the recruited student was in the process of completing either one year or a full course of study by a time between March and June 2011. Wilson argued that because the regulations did not come into effect until July 2011, CEC could have continued payments under the Plan until June 30, 2011. Its decision to terminate the *671 plan on February 28 was, he contended, arbitrary and in bad faith. Wilson also asserted that even if CEC did not breach the Plan, it was unjustly enriched because it benefitted from representatives’ efforts to recruit extra students in anticipation of receiving bonuses, but it did not pay for this benefit. Wilson estimated that the aggregate damages to his proposed class exceeded $5 million.
The district court dismissed Wilson’s individual case outright. It reasoned that the provisions of the Plan governing termination expressly provided that on any given day, a representative was entitled only to bonuses for the students who had completed their full program or a full year of study. The Plan also explicitly reserved CEC’s right to terminate the program at any time. The net effect of these two provisions was to give CEC the right to terminate the program on February 28, 2011, with respect to all bonuses for which the preconditions to payment had not yet been met. The court rejected Wilson’s claim for unjust enrichment on the theory that a claim for unjust enrichment may not be brought where a contract governs the relationship between the parties. The court also noted that even if there was no enforceable contract, there was no unjust enrichment because Wilson was paid a salary for his work, and an employee does not unjustly enrich his employer if he “work[s] extra hard” in the hopes of earning a bonus.
II
For the reasons set forth in Judge Oar-row’s separate opinion, a majority of the panel has concluded that Wilson has successfully pleaded a claim for relief on his third theory—that CEC exercised its right to terminate the Plan in bad faith and in violation of the implied covenant of good faith and fair dealing. Judge Hamilton’s separate opinion indicates his agreement with Judge Barrow’s position on the implied-covenant theory and his disagreement with aspects of the majority’s decision on the breach-of-contract theory. Judge Wood would affirm the judgment of the district court, and thus dissents from the ultimate disposition of the case. Judge Darrow, however, joins Judge Wood’s conclusions (a) that CEC’s bonus plan was an enforceable contract, (b) that CEC had the unambiguous right to terminate that contract and to refuse to pay bonuses for students in the pipeline, and (c) that the existence of an enforceable contract precludes any recovery under an unjust-enrichment theory. In the final analysis, this means that the judgment of the district court is reversed and the case is remanded to that court for further proceedings on the implied-covenant theory.