In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1063

RILEY J. WILSON, on behalf of himself
and all others similarly situated,

*Plaintiff-Appellant,*

*v.*

CAREER EDUCATION CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-05453 — **Geraldine Soat Brown**, *Magistrate Judge.*

ARGUED SEPTEMBER 23, 2016 — DECIDED DECEMBER 22, 2016

Before RIPPLE, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Riley Wilson sued Career Education
Corporation (CEC) alleging that CEC owed him the payment of
bonuses for students that he had recruited, as an admissions
representative, to CEC's culinary arts college. This is the second
appeal by Wilson in this case. Wilson initially argued that he
was entitled to the bonuses under numerous legal theories,

including that: (1) CEC breached its employment contract with him by failing to pay the bonuses; (2) CEC was unjustly enriched; and (3) CEC violated an implied covenant of good faith and fair dealing that is implicit in the contract. In his first appeal to this court, we upheld the dismissal of the claim on the first two grounds, but a majority held that the complaint survived dismissal on the claim that CEC violated the implied covenant of good faith and fair dealing. *Wilson v. Career Educ. Corp.*, 729 F.3d 665 (7th Cir. 2013) (*Wilson I*). We remanded for further proceedings on that claim.

The facts underlying the case are set forth in detail in our earlier opinion, and will only be briefly summarized here. Wilson worked for CEC as an admissions representative recruiting students to enroll in CEC's culinary arts college. Under the incentive compensation provision in his contract (called the Plan) with CEC, Wilson was entitled to a bonus for each student that he recruited above a definite threshold who either completed a full course or a year of study. If a representative was terminated, he was entitled only to bonuses already earned, which would not include students "in the pipeline" who had enrolled but had not yet completed a full course or a year of study as of the date of the representative's termination. Moreover, the Plan explicitly reserved to CEC the right to "terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or any other reason that CEC determines, in its sole discretion." Accordingly, Wilson would have been entitled to a bonus only as to recruited students above his minimum threshold who completed the full course or a year of study, during a time at which he remained employed,

and at a time in which CEC had not exercised its discretion to terminate the Plan before those conditions were met.

In October 2010, the Education Department released regulations that would become effective in July 2011, that would prohibit institutions such as CEC which were participating in Title IV student financial aid programs from providing bonuses based directly or indirectly on securing enrollment. Accordingly, as of July 2011, CEC would be prohibited from paying bonuses under the Plan. CEC did not wait until July 2011 to cease the payment of bonuses, however. Instead, after internal discussions, CEC decided to pay only bonuses that were earned as of February 28, 2011, thereby depriving Wilson of bonuses that were in the pipeline at that time. In place of the incentive compensation structure, CEC implemented a revised compensation program. That program provided to every currently employed admissions representative a raise in base salary of at least the total of 3% plus 75% of his or her previous two years' bonuses. Some representatives received higher compensation under the revised plan, while others fared worse. Wilson sued on behalf of himself and others similarly situated; the only claim still remaining is his claim that the decision to terminate the bonus payments in February 2011 constituted a breach of the implied covenant of good faith and fair dealing.

A majority held in *Wilson I* that CEC had the unambiguous right to terminate the contract and to refuse to pay the bonuses for students in the pipeline. *Id.* at 671. Although CEC retained the right to terminate the contract, we further held that under the implied covenant of good faith and fair dealing, CEC's discretion to terminate the Plan and refuse to pay the unearned bonuses was limited by the reasonable expectations of the

parties. *Id.* at 673. Accordingly, we held that Wilson could succeed in his claim if he could prove that CEC exercised its discretion in a manner contrary to the reasonable expectations of the parties. *Id.* at 675 (citing *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987)).

Wilson argued to the district court on remand that cost savings, not the desire to comply with the regulations, was the primary driver in CEC's decision to terminate the Plan in February 2011. But the district court rejected that argument, holding that the facts did not support it. Among the facts refuting Wilson's contention, the court identified as most significant that Wilson admitted there were no cost savings to CEC, and that the alteration in the compensation structure left macro-costs stagnant. The court held that there was no evidence that CEC retained for itself $5 million in bonus payments that were due admissions representatives, as Wilson alleged. Because no reasonable jury could conclude that CEC chose February 28 as the date to end the Plan bonuses in order to retain the bonuses for itself, the court granted CEC's motion for summary judgment. Wilson now appeals that determination to this court.

As we recognized in *Wilson I*, an avowedly opportunistic decision to terminate bonuses would not comport with the reasonable expectations of the parties. *Id.* at 675, citing *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987). Thus, if CEC used the excuse of the impending regulations to prematurely terminate the bonuses in a "money grab" unrelated to any legitimate business expectations, that arbitrary termination of bonuses would violate the objectively reasonable expectations of the parties. The parties could reasonably expect that alter-

ations in the Plan terms would be made in good faith, although the good faith requirement is a limited inquiry:

> The element of good faith dealing implied in a contract 'is not an enforceable legal duty to be nice or to behave decently in a general way.' [citation omitted] It is not a version of the Golden Rule, to regard the interests of one's contracting partner the same way you regard your own. An employer may be thoughtless, nasty, and mistaken. Avowedly opportunistic conduct has been treated differently, however.

*Jordan*, 815 F.2d at 438. If CEC used the impending regulation as an excuse to avoid payments arbitrarily, that would be the type of avowedly opportunistic conduct that would evince a lack of good faith and fair dealing. Thus, "it was reasonable for Wilson to expect that avoiding the three conditions needed for Wilson to earn a bonus on a recruited student would not be the but-for reason for CEC exercising its discretion." *Wilson I*, 729 F.3d at 675. Wilson argues that CEC's decision to terminate the Plan was made in violation of the covenant of good faith and fair dealing in that it was inconsistent with Wilson's reasonable expectation that CEC would not terminate the Plan early and that CEC acted with improper motivation.

As regards the first argument, Wilson acknowledges that the inquiry is an objective one, with the proper focus on whether the decision was inconsistent with the objectively reasonable expectations. In arguing that this standard was met, Wilson relies on evidence that: CEC had historically paid for all Plan compensation; CEC had never made substantive Plan changes

during the period of performance; CEC promoted the Plan in late 2010 as if it was going to continue paying through 2011; and Wilson was surprised that the Plan was ending early. The last factor rested on Wilson's testimony that he did not think the Plan would be terminated early and that "it was a big surprise" to him. But the determination as to whether an expectation is reasonable is an objective not a subjective determination. If Wilson's belief that the Plan would not be terminated or altered was not objectively reasonable, it would not matter that he actually held that belief.

The other arguments essentially amount to a contention that the Plan had never made changes in the past and had given no indication it was about to do so, and therefore any alteration in the Plan defied Wilson's objectively reasonable expectations. The failure of CEC to alter the Plan terms earlier did not create a reasonable expectation that it would never do so given the language in the contract preserving that right. As we recognized in *Wilson I*, the contract by its plain language makes clear that bonuses are only actually earned once the student has completed the academic program or one year of study. In short, a reasonable expectation that the Plan will be continued cannot arise solely from CEC's failure to exercise that option earlier or its failure to provide six months' notice of the termination. Nothing in the contract or the dealings between the parties would render such an expectation reasonable.

Moreover, in *Wilson I*, the majority held that under the plain language of the contract, Wilson could not have reasonably expected that CEC would only terminate the bonuses for good cause because the express terms of the Plan preclude such an expectation. *Id.* at 675. We recognized in *Wilson I* that CEC may

have had a number of reasons, including but not limited to regulatory compliance, for terminating the Plan early and refusing to pay bonuses that otherwise would have been earned before the new regulations became effective. It was not objectively reasonable for Wilson to expect that CEC would never exercise that option, or would do so only by following a certain notice procedure not required by the Plan, simply because it had failed to exercise the option in the past. Wilson has pointed to no evidence that CEC explicitly disavowed any intention to exercise its rights under the Plan in the future, and in fact the evidence in the record established that Wilson expected that the bonuses would be terminated but he hoped it would happen at a later date. Wilson's argument that CEC promoted the Plan as if it was going to continue paying cannot create an expectation that the provision will never be changed. Because the bonuses are earned only after a long period of time, the reality is that at any point in which the bonuses were eliminated, some of the payments would likely be in the pipeline at that time.

Significantly, Wilson does not argue that CEC promoted the recruitment bonus at a time at which it knew it would not pay the bonuses. It is undisputed that throughout the summer and fall of 2010, when the recruitment that would trigger the unpaid bonuses was occurring, there was no consensus among the CEC leadership as to when the Plan should be terminated. The timing of the termination was a topic of debate within CEC, with termination dates ranging from December 2010 to June 2011 proposed. Given the impending regulations, CEC's employees certainly knew that the bonuses would end, and in fact an interoffice memorandum to its admissions representatives in June 2010—before the start of the third quarter—stated

that CEC was reviewing the incentives compensation rules proposed by the Department of Education. In addition, on November 2, 2010, the CEO informed all employees of CEC that the Plan would need to change in order to comply with the Department of Education rules issued on October 29, 2010. Nothing in CEC's past conduct or its statements to the employees gave them a reasonable expectation that the bonuses would be paid right up to the regulatory deadline. The decision to terminate bonuses as of February 2011 was not made until early December 2010, and was immediately communicated to the admissions representatives. Although Wilson may have reasonably expected that CEC would not promise a bonus which it intended to withdraw before payment, there is no allegation of such behavior here. **See** *Trovare Capital Group, LLC v. Simkins Industries, Inc.,* 794 F.3d 772, 779 (7th Cir. 2015) (can show violation of implied covenant of good faith and fair dealing by demonstrating the party had no intention of completing the deal but continued the sham negotiations). Given the contract language, Wilson could not reasonably expect that bonuses would not be terminated prior to the July 2011 effective date of the regulation.

Wilson additionally argues that he demonstrated that the termination of the bonus was made in bad faith. He asserts that the district court failed to credit his evidence on summary judgment, and that he provided evidence that the actual reason for CEC's action was because of its deteriorating financial condition rather than the regulation.

As we stated, if CEC chose to use the impending regulation and the need to end the bonuses in July as an excuse to terminate it early merely to deprive its employees of their bonuses,

without any business necessity or other reason than an intent to exploit the opportunity, such an action could be beyond the reasonable expectation of the parties that the employer would act in good faith and change the Plan only for a legitimate reason. Wilson argues that CEC acted in bad faith because it altered the salary structure in response to its deteriorating economic condition, and not because of the impending regulation. We noted in *Wilson I*, however, that the mere presence of a reason other than the regulation does not itself render the actions in bad faith. *Wilson I*, 729 F.3d at 676 (noting that CEC might have had a number of reasons to terminate the Plan early, but the stated reason raised questions given the timing of the termination). The relevant question is whether that reason demonstrates bad faith, or is the type of reason that would be beyond the reasonable expectations of the parties.

Wilson argues that he should survive summary judgment because he provided sufficient evidence that CEC terminated the bonuses because it was facing an economic crisis and eliminated the bonuses to save money. The district court characterized the undisputed evidence as indicating that no money was saved by the changes to the bonuses because the salary structure was changed so that employees received higher base salaries plus salary increases that correlated with 75% of their bonus average for the past two years. The record appears to bear out that conclusion. Even if we accept Wilson's characterization of the record, however, that CEC acted to cut expenses in response to an economic crisis, that is precisely the type of reason that employees would reasonably expect would result in an alteration of salary. The covenant of good faith and fair dealing requires only that discretion be exercised reason-

ably with proper motive rather than arbitrarily or capriciously or in a manner inconsistent with reasonable expectations. *McCleary v. Wells Fargo Sec., LLC*, 29 N.E.3d 1087, 1093 (Ill. App. Ct. 2015); *Resolution Trust Corp., v. Holtzman*, 618 N.E.2d 418, 424 (Ill. App. Ct. 1993). A need to address a significant financial crisis is unquestionably a proper—as opposed to arbitrary or capricious—motive for a business.

The contract reserved the right to terminate the Plan and retain unearned bonuses at any time, and it would be objectively unreasonable for Wilson to believe that such discretion would not be exercised where a changing business climate significantly worsened the financial condition of the company. A business that retains the right to alter salaries of a compensation structure cannot be said to have acted in bad faith when it does so in times of a substantial financial downturn.

Wilson himself argues that CEC in fact faced such a financial downturn and that the termination of the bonuses was enacted to cut costs in response to that. In his brief, Wilson asserts that CEC was faced with decreasing student admissions and a concomitant decline in revenues. He states that the second quarter of 2010 reflected a weaker financial performance, the third quarter was worse, and the downward trend continued into the fourth quarter of 2010. He further states that in the meantime, costs were increasing. He argues that CEC saw where the business was heading, particularly with the growing hostility to for-profit schools, knew that it would face increasing financial pressure, and viewed the termination of the Plan as a way to manage those issues. Wilson asserts that whether CEC's decision to terminate the Plan was entirely cost-savings driven, or because it wanted to be perceived as a good corporate

citizen, or because it wanted to synchronize its payment and performance reviews with the other employees, it made that decision in bad faith because it was done at the expense of its employees and redirected those funds to its own corporate interests. But an employer does not act in bad faith when acting in furtherance of legitimate corporate interests that would reasonably have been in the contemplation of the parties. **See** *McCleary*, 29 N.E.3d at 1093, quoting *RBS Citizens, Nat'l Assoc. v. RTG-Oak Lawn, LLC*, 943 N.E.2d 198, 207 (Ill. App. Ct. 2011)) (the purpose of the duty of good faith and fair dealing "'is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.'"). Wilson already lost his breach of contract claim and therefore cannot merely allege that the bonuses were owed to him and that CEC could not properly retain it. A termination of bonuses to address a financial downturn, or to mitigate the damage to reputation or salary structure caused by the impending regulation, is not an action that can be characterized as being in bad faith or beyond the objectively reasonable expectations. Those are all legitimate business reasons for altering a salary and compensation structure, and a decision based on such reasons could not violate the objectively reasonable expectations of the parties.

We note that the relevant issue here is not whether CEC was forthcoming in stating that the termination of the bonuses in February 2011 was due to the regulations rather than acknowledging that the timing related to its financial peril. Instead, the proper issue is whether CEC eliminated the bonus for an improper motive. We held in *Wilson I* that the claim could

proceed beyond the dismissal stage because the timing of the termination cast doubt on CEC's claim that the motive was compliance with the regulation. *Wilson I*, 729 F.3d at 676. Although that timing left open the possibility of an improper motive, Wilson on summary judgment argues that the record reveals the actual motive, which was to address its precipitous financial decline. But having a different motive than the one expressed to its employees does not violate the contract's implied duty of good faith and fair dealing. The relevant question is whether that actual motive was improper and whether the termination failed to comport with the parties' reasonable expectations. Wilson does not argue that CEC in fact did not face financial difficulties, or that an alteration in the salary structure was unnecessary to address that problem; to the contrary, Wilson argues that CEC actually faced a serious financial decline. Wilson has failed to argue that the evidence allows a jury to infer an *improper* motive, as opposed to a proper motive different from the one expressed to its employees. Accordingly, even accepting Wilson's characterization of the record, the evidence is insufficient to allow a jury to reasonably conclude that CEC breached the implied covenant of good faith and fair dealing.

The decision of the district court granting summary judgment to the defendant is AFFIRMED.