In the

# United States Court of Appeals
### For the Seventh Circuit

————————

Nos. 05-3242 & 05-3351

BIOMET ORTHOPEDICS, INC.,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

TACT MEDICAL INSTRUMENTS, INC.,

*Defendant-Appellant,*
*Cross-Appellee.*

————————

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 3:01 CV 895 PS—**Philip P. Simon**, *Judge.*

————————

ARGUED JUNE 8, 2006—DECIDED JULY 19, 2006

————————

Before EASTERBROOK, ROVNER, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* For 12 years TACT Medical was the exclusive distributor in Japan of medical devices made by Biomet Orthopedics. At the conclusion of its distributorship in February 2001, TACT had a choice under §2.3 of the contract:

> [After] this Agreement has been terminated . . . TACT may at its sole discretion continue distribution of the Products and parts which TACT owns in

its inventories and/or request BIOMET to repurchase those Products and parts back at the price equal to that paid by TACT to BIOMET, with the costs of carriage, insurance, duty and charges required for such return being borne by [Biomet] . . . .

TACT asked Biomet to repurchase its inventory, and it agreed—provided that the goods were delivered to it in Japan. Biomet did not want to import them a second time, which would require not only extra customs duties but also approval from Japanese medical-device regulators. That process could delay by a year or more Biomet's ability to compete in the Japanese market. For strategic or spiteful reasons, however, TACT refused to deliver to Biomet in Japan. The entire inventory, worth about $7 million, was shipped to O'Hare Airport in Chicago— where it sits to this day in a customs warehouse.

Biomet filed this suit under the diversity jurisdiction, seeking damages on the theory that, while the distributorship lasted, TACT had failed to use its best efforts to sell Biomet's products. TACT filed a counterclaim seeking payment for the inventory in the warehouse at O'Hare Airport. A choice-of-law clause in the contract makes Indiana law controlling on these issues. Answering special interrogatories, a jury concluded that: (1) TACT had exerted best efforts and is not liable to Biomet; (2) Biomet was required by the contract to repurchase the inventory on TACT's request; and (3) TACT's refusal to honor Biomet's request to deliver that inventory in Japan, and its shipment to the United States (effectively excluding Biomet from the Japanese market for more than a year), was commercially unreasonable and excused Biomet from the obligation to repurchase the inventory. In a comprehensive and thoughtful opinion, the district judge denied both sides' motions under Fed. R. Civ. P. 50. It also denied Biomet's request for attorneys' fees. Both sides have appealed. TACT contends

that Biomet must pay for the inventory. Biomet has abandoned its contention that TACT violated the contract by failing to employ best efforts to sell more products but insists that it has a contractual entitlement to recover attorneys' fees.

The district judge allowed the jury to decide whether the word "request" in the passage we have reproduced above means "require," and that step is problematic. This contract has an intrinsic ambiguity: if "request" is read literally then the whole clause beginning with "and/or request" is pointless, for TACT did not need a contract to "request" Biomet to do something. Neither side offered any evidence about the negotiations that led to the use of "request" rather than "require" or about the customs of the trade; both sides have staked their all on the contract's text. Interpreting contractual language is a job for the court when no parol evidence bears on its meaning. *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001); *First Federal Savings Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990).

But no harm was done: the jury understood the contract exactly as the judge (rightly) did in the post-trial ruling. Indiana prefers interpretations that avoid making contractual language surplusage. See *Walb Construction Co. v. Chipman*, 202 Ind. 434, 442, 175 N.E. 132, 135 (1931); *Whitaker v. Brunner*, 814 N.E.2d 288, 294 (Ind. App. 2004); *Robinson v. Century Personnel, Inc.*, 678 N.E.2d 1268, 1270 (Ind. App. 1997). In context—which is how all language should be read—§2.3 gives TACT a choice between selling inventory on hand (even though it has lost its exclusive right to distribute Biomet's products and cannot obtain new items that its customers may require) and making a clean break from the business.

Having exercised the option to sell the inventory back to Biomet, TACT had to make a delivery. Biomet wanted delivery in Japan; TACT did not agree. The Uniform Commercial Code (applied via the contract's choice-of-law

clause) spells out what happens if the parties to a sale do not specify a place of the delivery. Section 2-308 (enacted in Indiana as Ind. Code §26-1-2-308) says that "[u]nless otherwise agreed: (a) [t]he place of delivery of goods is the seller's place of business". Section 2-504 (Ind. Code §26-1-2-504) adds that, when delivery does not occur by an on-premises exchange under §2-308, then "unless otherwise agreed [the seller] must (a) [p]ut the goods in the possession of a carrier and make such a contract for their transportation as may be reasonable". So if shipment was required, TACT had to make reasonable provision for delivery; if shipment was not required, TACT had to make the inventory available at its own place of business in Japan. It did not do the latter, and what is "reasonable" is a classic jury question.

This jury determined that shipment to the United States was not a "reasonable" provision for delivery and excused Biomet from any obligation to pay. That decision was well supported by evidence about Biomet's reasons for wanting delivery in Japan. Commercial norms point the same way. A person who orders an automobile to drive in Japan need not pay if the seller ships it to Chicago; just so with medical equipment. TACT relies heavily on *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002), for the proposition that business dealings (including contracts) should be read to make business sense. That does far more to support Biomet's position than TACT's.

TACT has never argued that delivery to Chicago was "reasonable." Instead it maintains that the parties *agreed* to delivery in Chicago, activating the "unless otherwise agreed" clauses in §2-308 and §2-504. But where is that agreement to be found? Biomet insisted from the get-go on delivery in Japan. Section 2.3, which gave TACT a put option on its inventory, does not say where goods should be sent. Nor does §1.12, captioned "Return of Products", which allows TACT to sell any product back to Biomet at a 20%

discount (called a "restocking charge"). TACT locates the "agreement" in the contract's Exhibit C.5, captioned "Shipment and Risk of Loss". This reads:

> All goods are sold F.O.B. U.S. airport and/or U.K. airport in accordance with the prices set forth in Exhibit B. The method and route of shipment are at Biomet's discretion, unless TACT timely supplies explicit instructions otherwise. Biomet shall tender delivery of all goods to a carrier for transportation to TACT's place of business, but all remaining costs of transportation and shipment shall be borne by TACT, and all risks of loss shall pass to TACT when the goods are made available to the carrier at U.S. and/or U.K. airport including, without limitation, all risks of loading, transportation and shipment. All claims for loss, damage or delay against the carrier shall be borne by TACT.

TACT maintains that Biomet has agreed to a return to the goods' point of origin (an airport in the United States or the United Kingdom). But this is not at what Exhibit C.5 says. It governs shipment from Biomet to TACT but not the other direction. An F.O.B. term is a risk-shifting provision, not a designation of destination. See Ind. Code §26-1-2-319. (The proprietors of the UCC deleted §2-319 from the Official Version in 2003, deeming F.O.B. and F.A.S. terms to be obsolete; Indiana has not responded to this recommendation, so §2-319 remains in force in that state.) Products are to be "free on board" the carrier (so Biomet bears the cost and risk to that point); expense and risk on the remaining journey are, as the clause adds (redundantly, given the meaning of F.O.B.), the recipient's. If, however, we treat this part of the contract as reversible, then the second sentence (with the parties switched) supplies the answer: "The method and route of shipment are at [TACT's] discretion, unless [Biomet] timely supplies explicit instructions

otherwise." Biomet gave TACT timely, explicit instructions for delivery; TACT wilfully ignored them.

Biomet's cross-appeal relies on §3.2 of the contract, in which TACT agrees to pay "costs and attorney's fees arising from any breach of this agreement by TACT." The problem with Biomet's argument, as the district judge aptly observed, is that TACT did not break the contract. The contract called on TACT to use its best efforts to sell Biomet's products; the jury found that TACT had done so. TACT's failure to deliver the inventory to Biomet in Japan was not a "breach" of the contract, which gave TACT the option but not a duty to sell the inventory back to Biomet. TACT had paid for the goods; once the distributorship (and the best-efforts obligation) came to a close, TACT was free to drop the products into the Sea of Japan or the crater of Fujiyama without violating any duty owed to Biomet. By shipping the inventory to O'Hare Airport TACT lost $7 million; it did not also undertake to pay Biomet's lawyers. Indiana law uses the American Rule, which presumptively requires litigants to bear their own legal expenses. See *Shumate v. Lycan*, 675 N.E.2d 749, 754-55 (Ind. App. 1997). Because TACT did not violate any contractual duty, there is no basis for departing from that norm.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*