## FOR PUBLICATION



**FILED**

Oct 09 2013, 6:12 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ROBERT J. PALMER**
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEY FOR APPELLEES:

**ALADEAN M. DeROSE**
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

SPECIALTY FOODS OF INDIANA, INC.,        )
d/b/a JERSEY MIKE'S SUBS,                )
                                         )
    Appellant-Plaintiff,           )
                                         )
      vs.                        )    No. 71A05-1302-MI-95
                                         )
CITY OF SOUTH BEND and CENTURY           )
CENTER BOARD OF MANAGERS,                )
                                         )
    Appellees-Defendants.          )

APPEAL FROM THE ST. JOSEPH CIRCUIT COURT
The Honorable Michael G. Gotsch, Sr., Judge
Cause No. 71C01-1212-MI-00244

**October 9, 2013**

**OPINION - FOR PUBLICATION**

**DARDEN, Senior Judge**

## STATEMENT OF THE CASE

Specialty Foods of Indiana, Inc. III, d/b/a Jersey Mike's Subs ("Specialty Foods"), appeals the trial court's order denying its complaint for declaratory judgment.

We affirm.

## ISSUE

Specialty Foods presents three issues for our review, one of which is dispositive: whether the force majeure clause of the agreement between Specialty Foods and the Century Center Board of Managers for the City of South Bend ("Century Center") applies to excuse the Century Center's further performance under the agreement.

## FACTS AND PROCEDURAL HISTORY

On July 16, 1993, the City of South Bend ("City") entered into a Management Agreement with the National Football Foundation and College Hall of Fame, Inc. ("NFF") and the Century Center. On the same day, the City also entered into a License Agreement with the NFF. Both agreements concerned the construction and operation of a building in South Bend to house the College Football Hall of Fame ("Hall of Fame"). The agreements contained an initial term of forty years with automatic five-year renewals thereafter unless proper notice was given. Construction of the massive building to house the Hall of Fame was completed by August 1995.

On April 19, 2000, the Century Center entered into a Use Management and Operations Agreement ("UMO Agreement") with Specialty Foods for Specialty Foods to be the exclusive provider of food and beverages in the Hall of Fame. The initial term of

2

the agreement was five years with two five-year renewal options, both of which were exercised by Specialty Foods. Pursuant to the agreement, Specialty Foods would occupy only 3,286 square feet of the vast Hall of Fame building.

In August 2001, the City, the Century Center, and the NFF entered into an Interim Agreement for the operation of the Hall of Fame. In that agreement, the parties acknowledged that the financial results of the Hall of Fame had been less favorable than anticipated at the time of execution of the Management and License Agreements. In an effort to reduce the City's financial burden of operating the Hall of Fame, the NFF agreed to assume the management and operation of the Hall of Fame during the interim term of January 1, 2001 to December 31, 2005. Subsequently in July 2006, the City, the Century Center, and the NFF entered into a Second Interim Agreement, which extended the interim period for an additional five years to December 31, 2010.

The trial court found that in 2009, during the second interim period, the NFF indicated its intent to relocate the Hall of Fame to Atlanta, Georgia. Appellant's App. p. 7. In addition, the trial court found that in July 2012, the NFF officially announced its imminent departure from South Bend and the closing of the Hall of Fame in South Bend on December 31, 2012. *Id.* By exercising its final five-year renewal option on May 18, 2010, Specialty Foods expressed its desire to extend its agreement with the Century Center until August 2015. However, in August 2012, the City formally notified Specialty Foods that the Hall of Fame in South Bend would close as of January 1, 2013, due to its

3

relocation to Atlanta, Georgia, and that cessation of the Hall of Fame's presence in the city necessarily terminated Specialty Foods' agreement with the Century Center.

On December 28, 2012, Specialty Foods filed a complaint against the City and the Century Center for a declaratory judgment as to its rights to continue operating its business in the Hall of Fame building under the UMO Agreement. Following a hearing, the trial court issued its order denying Specialty Foods' request for declaratory judgment. This appeal ensued.

DISCUSSION AND DECISION

Specialty Foods contends the trial court erred by applying the force majeure clause of the UMO Agreement to excuse the Century Center's performance under that agreement when the NFF moved the Hall of Fame from South Bend to Atlanta, Georgia.

The interpretation of a contract is a pure question of law and is reviewed de novo. *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005). The objective of a court when it interprets a contract, including a force majeure provision, is to determine the intent of the parties at the time the contract was made by examining the language used in the contract. *See State Farm Fire & Cas. Co. v. Riddell Nat'l Bank*, 984 N.E.2d 655, 658 (Ind. Ct. App. 2013), *trans. denied*. Further, in determining the intention of the parties, a contract should be considered in light of the circumstances existing at the time it was made. *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012). For example, the court should consider the nature of the agreement, the facts and circumstances leading up to the execution of the contract, the relationship of the parties,

4

the nature and situation of the subject matter, and the apparent purpose of making the contract. *Id.* Contracts are to be read as a whole, and a court should construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *State Farm*, 984 N.E.2d at 658. In addition, a court should attempt to harmonize the provisions of a contract rather than interpret the provisions as conflicting. *Id.*

In the present case, the trial court ruled that the force majeure clause in the UMO Agreement excused the Century Center from performing its obligation of allowing Specialty Foods to continue to operate its business in the Hall of Fame building after the Hall of Fame terminated the Management and License Agreements and moved from South Bend. A force majeure clause is defined as a "contractual provision allocating the risk if performance becomes impossible or impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled." *Black's Law Dictionary* 674 (8th ed. 2004). We note that Indiana has very few cases interpreting force majeure clauses, and those that do exist pertain to issues not before us today. Therefore, we turn to guidance from other jurisdictions.

Historically, the theory of force majeure embodied the concept that parties could be relieved of performance of their contractual obligations when the performance was prevented by causes beyond their control, such as an act of God. *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 282 (Tex. App. 1998). However, much of the theory's "historic underpinnings have fallen by the wayside" with the result that force majeure is

now "little more than a descriptive phrase without much inherent substance." *Id.* at 283. Indeed, the scope and effect of a force majeure clause depends on the specific contract language, and not on any traditional definition of the term. *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App. 2009). In other words, when the parties have defined the nature of force majeure in their agreement, that nature dictates the application, effect, and scope of force majeure with regard to that agreement and those parties, and reviewing courts are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended. *Sun*, 984 S.W.2d at 283. The party seeking to excuse its performance under a force majeure clause bears the burden of proof of establishing that defense. *Va. Power*, 297 S.W.3d at 402.

We begin by determining the intent of the parties through examination of the language they used in the contract. *See State Farm*, 984 N.E.2d at 658. The force majeure provision in the UMO Agreement provides:

> In the event Century Center or [Specialty Foods] shall be delayed or hindered or prevented from the performance of any obligation required under this Agreement by reason of strikes[,] lockouts, inability to procure labor or materials, failure of power, fire or other casualty, acts of God, restrictive governmental laws or regulations, riots, insurrection, war or any other reason not within the reasonable control of Century Center or [Specialty Foods], as the case may be, then the performance of such obligation shall be excused for the period of such delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

6

Appellant's App. p. 34. The parties agree that the specific language from the force majeure provision in the UMO Agreement with which we are concerned is the phrase "any other reason not within the reasonable control of Century Center."

Specialty Foods argues that the force majeure provision of the UMO Agreement is inapplicable to excuse the Century Center's performance because the termination of the Management and License Agreements was "not unforeseeable." Appellant's Br. p. 15. However, the force majeure provision in this case contains nothing about foreseeability, and Specialty Foods points to neither terms in the provision nor in the remainder of the parties' contract in support of its argument. The scope and effect of a force majeure clause depends on the specific contract language. *Va. Power*, 297 S.W.3d at 402.

Further, there is no evidence before us that the bargaining between the parties was not free and open. The City, the Century Center, and Specialty Foods are sophisticated parties presumably represented by counsel who were at liberty to define the nature of force majeure in whatever manner they desired. We decline to rewrite the parties' contract by interjecting into the force majeure provision a requirement of foreseeability. *See Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1168 (Ind. Ct. App. 1995) (stating that parties to contract have right to define their mutual rights and obligations, and courts may not write new contract), *trans. denied*.

Additionally, in support of its argument that the parties' force majeure provision is inapplicable in this instance, Specialty Foods cites *Kel Kim Corp. v. Central Markets, Inc.*, 519 N.E.2d 295 (N.Y. 1987). In *Kel Kim*, the force majeure provision provided:

7

> If either party to this Lease shall be delayed or prevented from the performance of any obligation through no fault of their own by reason of labor disputes, inability to procure materials, failure of utility service, restrictive governmental laws or regulations, riots, insurrection, war, adverse weather, Acts of God, or other similar causes beyond the control of such party, the performance of such obligation shall be excused for the period of the delay.

519 N.E.2d at 296 n.*. The New York Court of Appeals determined that the force majeure provision did not apply because the event that prevented Kel Kim's performance under the contract was neither specifically included in the force majeure provision nor generally included within the provision's catchall phrase "or other similar causes beyond the control of such party." The court explained that the event (i.e., the inability of Kel Kim to procure and maintain liability insurance) was of a different kind and nature from the particular events listed in the force majeure provision such that it could not be considered a "similar cause."

Specialty Foods' reliance upon *Kel Kim* is misguided. The force majeure clause in *Kel Kim* is distinguishable from the clause in the instant case primarily due to its inclusion of the phrase "or other similar causes." This is a limiting phrase that the court determined required the event causing the non-performance of a party to be similar to the events specifically spelled out in the provision of the parties' contract. The provision in the present case does not contain such a restrictive clause. Rather, the parties here agreed that when an event occurs, the cause of which is "any other reason" not within the reasonable control of the parties, the performance of obligations under the agreement shall be excused. Thus, instead of a limiting clause, the Century Center and Specialty

8

Foods included broad terminology that does not require the non-performance triggering event to be similar to the specific causes listed in the force majeure provision. We remain mindful that we must look to the specific language of the contract. *See Va. Power*, 297 S.W.3d at 402. Accordingly, the underlying rationale of the decision in *Kel Kim* is not applicable here.

Next, we determine the intent of the parties through consideration of the circumstances existing at the time the contract was made. *See Allen*, 980 N.E.2d at 309. The Management Agreement, the License Agreement, and the UMO Agreement were all admitted as evidence in this case. These documents enable us to ascertain the purpose of the UMO Agreement and the circumstances surrounding its making. Pursuant to the Management and License Agreements executed in July 1993, the City designed, financed, and constructed a facility specifically to house the Hall of Fame. Subsequently, in April 2000, the Century Center and Specialty Foods entered into the UMO Agreement. In the prefatory language of the UMO Agreement, Specialty Foods acknowledged the need for the Century Center "to manage and operate a facility that is of the highest quality when compared to other sports museums or halls of fame operating in the United States." Appellant's App. p. 23. The initial article of the UMO Agreement sets forth Specialty Foods' "exclusive rights *in connection with*" the Hall of Fame and granted Specialty Foods the right to be the exclusive provider of food and beverages in the Hall of Fame. *Id.* (emphasis added). In addition, Specialty Foods acknowledged in the UMO Agreement that it had reviewed and agreed to act in conformity with the License

9

Agreement and the Management Agreement, a portion of which states that the parties recognize "their collective goal of enhancing and maximizing attendance at the Hall of Fame." *Id.* at 23, 44. Moreover, the License Agreement provides that the City agreed to continuously use the building to operate the Hall of Fame and to provide prompt and efficient service to all of the customers of and visitors to the Hall of Fame. *Id.* at 78.

In considering these circumstances surrounding the making of the UMO Agreement and the purpose the parties intended to accomplish by entering into the contract, it is clear that Specialty Foods' operation in the Hall of Fame building was ancillary to and contingent upon the existence of the Hall of Fame. After having the Hall open for several years, the City and the Century Center decided to have Specialty Foods provide food and drinks to the visitors of the Hall. The purpose was to use the services of Specialty Foods, the ancillary vendor, to enhance the products and services of the Hall of Fame, the primary business, in order to make the Hall of Fame a facility of the highest quality as stated in the UMO Agreement. Thus, when the Hall of Fame ceased to exist in South Bend, so too did the need for the services provided by Specialty Foods.

Therefore, given the language used in the force majeure provision and elsewhere in the contract, the nature of the agreement, the circumstances surrounding the execution of the contract, and the apparent purpose of making the contract, we conclude that the terms of the force majeure provision excusing performance for "any other reason not within the reasonable control of Century Center" includes the closure and relocation of the Hall of Fame. Certainly, the phrase "any other reason" includes a broad spectrum of

10

events, and the Hall of Fame's closure and departure from South Bend was a cause not within the reasonable control of the City or the Century Center. Therefore, we hold, as a matter of law, that the City's or the Century Center's inability to perform was solely due to an event of force majeure as defined in the contract.

## CONCLUSION

For the reasons stated, we conclude that the force majeure provision of the UMO Agreement is applicable to excuse the Century Center's non-performance of its obligations under the Agreement because the closure of the Hall of Fame in South Bend constitutes a "reason not within the reasonable control of Century Center."

Affirmed.

BARNES, J., and CRONE, J., concur.

11