In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 19-2315 & 19-2410

ACHERON MEDICAL SUPPLY, LLC,

*Plaintiff-Appellant-Cross-Appellee,*

*v.*

COOK MEDICAL INC., *et al.*,

*Defendants-Appellees-Cross-Appellants.*

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 15-cv-01510 — **William T. Lawrence**, *Judge.*

ARGUED JANUARY 16, 2020 — DECIDED MAY 6, 2020

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* This set of cross-appeals arises
from a distribution agreement that each party asserts the
other breached. The district court concluded the plaintiff
breached the agreement and the defendant did not, but it also
held the plaintiff was not liable for its breach. Neither party
was content with the outcome. We conclude the district court
reached the correct result, and we affirm.

## I. Background

Cook Medical, LLC ("Cook") contracted with Acheron Medical Supply, LLC ("Acheron") in July 2014. The contract—a five-year distribution agreement—arranged for Acheron to serve as the exclusive distributor of certain Cook medical devices and products to the Veterans Administration ("VA") and Department of Defense ("DOD") Medical Centers, and the non-exclusive distributor of certain other of Cook's medical products to those same entities. According to Acheron's complaint, the parties began working together because Acheron possessed experience selling to the VA and DOD and would be able to "educat[e] Cook on the government purchasing programs." (Complaint, District Court Docket 1, at ¶10.) Additionally, Acheron is certified as a small business by the U.S. Small Business Administration, so utilizing Acheron as a distributor would potentially provide access to VA and DOD small business set-aside contracts.

Sales to the DOD and the VA are facilitated through Federal Award Schedules. Sales to the DOD are primarily made through a Distribution and Pricing Agreement ("DAPA"), while sales to the VA require a Federal Supply Schedule ("FSS"). Cook already had its own DAPA, but not an FSS; the agreement in part required Acheron to obtain an FSS to operate as a distributor of Cook's products to the VA.

Unfortunately, the relationship never achieved the results for which the parties had hoped. According to Acheron, this was entirely Cook's fault, for two reasons: 1) Cook refused to submit to a required audit of its commercial sales records, and 2) Cook refused to deactivate its DAPA, preventing Acheron from selling Cook products to the DOD through Acheron's own DAPA.

Regarding the first claim, because Acheron was a small business without significant sales to the public, the VA would not provide an FSS to Acheron without first having access to Cook's commercial sales records to confirm that the prices being offered by Acheron were fair and reasonable. This was required pursuant to a federal regulation that states, in relevant part:

> If you are a dealer/reseller without significant sales to the general public, you should provide manufacturers' information … for each item/SIN offered, if the manufacturer's sales under any resulting contract are expected to exceed $500,000. You must also obtain written authorization from the manufacturer(s) for Government access, at any time before award or before agreeing to a modification, to the manufacturer's sales records for the purpose of verifying the information submitted by the manufacturer. The information is required in order to enable the Government to make a determination that the offered price is fair and reasonable. To expedite the review and processing of offers, you should advise the manufacturer(s) of this requirement.

48 CFR § 515.408(b)(5).

Cook, however, did not anticipate that it would be required to provide such extensive information about its confidential sales records. Ronald Walters, a Sales Account Executive at Cook who worked with Acheron, testified at trial "he was shocked to learn that it was being requested."[1] Cook alleges that Acheron led it to believe the FSS could be acquired

---

[1] (Appendix of Defendants/Appellees at 3.)

using the pricing information available in Cook's DAPA. Although Walters later signed a release at Acheron's request allowing the VA to access Cook's sales records, and although Walters twice sent emails to Acheron and officials at the VA indicating Cook's willingness to undergo the audit,[2] Cook ultimately declined to submit the information requested by the VA's Office of Inspector General. Acheron attempted to move forward without Cook providing access to its sales records, but this proved impossible. In the end, the VA rejected Acheron's FSS application.

When Cook informed Acheron it would not provide the information necessary for the VA audit, it also informed Acheron that Cook had decided not to use Acheron to sell to the DOD, either. Cook would instead continue to sell to the DOD directly through its own DAPA. Since a manufacturer can only be listed on one DAPA at a time, Acheron was unable to make any sales of Cook products to the DOD through its DAPA if Cook's DAPA remained in place.

In April 2015, when Cook decided not to submit the records necessary for the VA audit and to continue making sales directly to the DOD, Walters sent an email to Acheron explaining these decisions and stating: "the contract remains in place and we will continue to consider business opportunities with Acheron under the terms and conditions of that

---

[2] Acheron does not argue the authorization letter or the emails were valid amendments to the Agreement with binding effect on Cook. The Agreement requires any modification or amendment to be "reduced to writing and duly executed" by both parties. The letter and emails do not purport to be amendments and were not signed by Acheron. *See Acheron Medical Supply, LLC v. Cook Inc.*, 2017 WL 4310163, *10 & n.11 (S.D. Ind. Sept. 28, 2017).

agreement." Acheron protested. Cook sent notice in July that Acheron was in material breach of the Agreement by failing to obtain an FSS and failing to use its best efforts to promote, solicit, and expand the sale of Cook products. Cook terminated the agreement 30 days later due to Acheron's failure to cure.

In response to Cook's termination of the Agreement, Acheron filed suit against Cook, asserting Cook breached the Agreement by preventing Acheron from obtaining an FSS contract and preventing Acheron's sales to the DOD. Cook asserted a counterclaim for breach of contract against Acheron. The district court granted summary judgment against Acheron on its claims, holding Cook did not breach the Agreement because it owed no duty to undergo the VA audit or deactivate its DAPA. After holding a bench trial on Cook's counterclaim, the court held Acheron materially breached its obligation to obtain an FSS but owed Cook no damages because the breach was excused by the Agreement's force majeure provision. Unsurprisingly, neither party was content with the entirety of the ruling, leading to the cross-appeals we consider today.

## II. Discussion

We review the district court's entry of summary judgment *de novo*, resolving all reasonable inferences in favor of the non-moving party. *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 708 (7th Cir. 1996). We review the court's legal conclusions following the bench trial *de novo*, and its factual findings for clear error. *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 379 (7th Cir. 2010).

Acheron's duty to obtain an FSS is clearly spelled out in the Agreement. The core issue of this case, however, regards

Cook's obligations under the Agreement. Acheron argues
Cook was obligated to submit to the VA audit and deactivate
its DAPA. Conversely, Cook argues (and the district court
held) the Agreement did not obligate Cook to do either. We
examine each of these potential obligations in turn.

> 1. The VA Audit

There is no language in the Agreement expressly obligat-
ing Cook to submit to the VA audit. The district court recog-
nized this, and further acknowledged that Indiana law[3] "zeal-
ously defend[s] the freedom to contract." *State v. Int'l Bus.
Machs. Corp.*, 51 N.E.3d 150, 160 (Ind. 2016). Indiana adheres
to "the 'four corners rule' that 'extrinsic evidence is not ad-
missible to add to, vary or explain the terms of a written in-
strument if the terms of the instrument are susceptible of a
clear and unambiguous construction.'" *Roberts v. Cmty. Hosps.
of Ind., Inc.*, 897 N.E.2d 458, 467 (Ind. 2008). On this basis, the
district court held Cook did not breach the Agreement by re-
fusing to allow access to its sales records.

Acheron asserts, however, that the district court improp-
erly focused on common law contract principles when the
Agreement is subject to the provisions of Indiana's version of
the Uniform Commercial Code (the Indiana Commercial
Code, or "ICC").[4] In particular, Acheron argues the ICC's

---

[3] The Agreement is governed by Indiana law pursuant to its choice of
law provision.

[4] The parties do not dispute that the Agreement is subject to the ICC.
We have recognized "the rule in the majority of jurisdictions is that dis-
tributorships (both exclusive and non-exclusive) are to be treated as sale
of goods contracts under the UCC." *See Sally Beauty Co., Inc. v. Nexxus
Prods. Co.*, 801 F.2d 1001, 1005–06 (7th Cir. 1986) (collecting cases); *see also
Warrick Beverage Corp. v. Miller Brewing Co.*, 352 N.E.2d 496, 500 (Ind. Ct.

implied duty of good faith and fair dealing obligated Cook to undergo the VA audit. Cook also argues the prevention doctrine, federal regulations, and the election-of-remedies doctrine all compel the conclusion that Cook breached the Agreement by not submitting to the audit.

### a. The Implied Duty of Good Faith

Acheron's primary argument relies on the ICC's implied duty of good faith.

Every contract governed by the ICC "imposes an obligation of good faith in its performance or enforcement." Ind. Code § 26-1-1-203. The ICC defines good faith as "honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." *Id.* § 26-1-1-201(19). However, the Comment to UCC § 1-203 (from which ICC § 26-1-1-203 is adopted) clarifies that this implied duty of good faith "does not create a separate duty of fairness and reasonableness which can be independently breached." Instead, it "applies generally … to the performance or enforcement of every contract or duty," so that "a failure to perform or enforce, in good faith, *a specific duty or obligation* under the contract, constitutes breach of that contract." Comment to Uniform Commercial Code § 1-203 (emphasis added). Regarding Illinois' version of § 1-203, we have explained: "The obligation of good faith and fair dealing … does not … permit a party to enforce an obligation not present in the contract." *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013). Instead, where a contract grants a party discretion in performing its obligations, this implied duty requires that party to exercise its discretion

App. 1976) (applying provisions of the Indiana Uniform Commercial Code to a distributorship agreement).

in good faith, rather than take opportunistic advantage of the other party. *See Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) (applying Illinois law) ("[T]he implied covenant of good faith is used as a construction aid to assist the Court in determining whether the manner in which one party exercised its discretion under the contract violated the reasonable expectations of the parties when they entered into the contract.").

There is unfortunately very little Indiana precedent interpreting or applying the ICC's duty of good faith. However, Acheron relies heavily on a Seventh Circuit case in which we applied another provision of the ICC. In *Biomet Orthopedics, Inc. v. TACT Med. Instruments, Inc.*, 454 F.3d 653 (7th Cir. 2006), the parties entered an agreement under which TACT would distribute Biomet's products in Japan. The agreement provided TACT could require Biomet to repurchase the remaining inventory at the end of the distributorship and required Biomet to pay for any delivery cost, but it did not specify whether the inventory would be shipped back to the United States or delivered to Biomet in Japan. TACT chose to ship the inventory back to the United States, despite Biomet's request for delivery in Japan. This cost Biomet a substantial amount in customs duties and greatly delayed its ability to compete in the Japanese market. *Id.* at 654.

We looked to the ICC's provision for determining place of delivery when the contract is silent on that point. *Id.* at 655 (quoting Ind. Code §§ 26-1-2-308, 26-1-2-504). The ICC imposed a duty on TACT either to make the inventory available at its own place of business or to "make reasonable provision for delivery." *Id.* The jury's finding that TACT's shipment of the inventory back to the United States was not reasonable

was well supported by the evidence and commercial norms. *Id.* Acheron cites *Biomet* to support its contention that the ICC required Cook to act reasonably and therefore obligated Cook to undergo the necessary audit.

*Biomet* does not support Acheron's argument. First, *Biomet* was based on a much more specific gap-filling provision of the ICC, and second, that provision only clarified the undecided details of a duty expressly contemplated by the agreement.

To the first point: *Biomet* dealt with a very specific ICC provision that requires reasonable provision for delivery to be made when the parties' agreement is silent on that point. That provision specifically addresses the gap the *Biomet* parties left in their contract: place of delivery. It also gives specific guidance on how to fill that gap: in the case of silence, the seller must either make the goods available at its place of business or make reasonable provision for shipment. Biomet had already agreed to repurchase the inventory and to pay for delivery. Only the place of delivery remained uncertain, and the ICC provision was expressly created to fill that gap. By contrast, Acheron is relying only on the ICC's general implied duty of good faith. This is not a specific provision written to address a circumstance in which the contract is silent on a specific term.

Second, the ICC did not require TACT to undertake an affirmative duty not provided for in the parties' agreement. It was already agreed by the parties that in the event of a repurchase TACT would make delivery in some form and Biomet would bear the costs. The only item left uncertain by the agreement was *where* that delivery would be made. Conversely, the Agreement in this case included no obligation for

Cook to make its confidential sales records available to the VA.[5] This is a far cry from the contract in *Biomet* that expressly contemplated delivery but simply never specified where it would occur.

In an effort to identify a specific duty within the Agreement through which the duty of good faith and fair dealing would require Cook to undergo the audit, Acheron points to the Agreement's force majeure provision. The Agreement states that neither party may be liable for a delay or default

> caused by force majeure, including, without limitation … act of government or … agency …. The party affected by such a condition shall use every possible effort to correct or eliminate the cause which prevents performance and resume performance as soon as possible.

---

[5] Although the district court found Cook "had not anticipated that it would have to provide the extensive information required by the VA," Acheron argues Cook reasonably should have known when entering the Agreement that providing the VA with access to its sales records would be necessary because the requirement was spelled out in the VA's regulations and on its website. Acheron's own pleadings, however, acknowledged that the parties negotiated the Agreement in part because Acheron represented it possessed knowledge and experience in government contracts processes and would be able to educate and help Cook enter that market. In Acheron's own words: "the processes of [the VA and DOD] are difficult for a vendor to navigate absent familiarity with them. Acheron offered that familiarity and the consequent opportunity to facilitate sales of Cook's medical products to the DOD and VA by educating Cook on the government purchasing programs." (Complaint, District Court Docket 1, at ¶10.) Acheron should have known better than to leave the important detail of the VA audit off the negotiation table.

(District Court Docket 1-1, at 9.) Acheron asserts the VA's denial of the FSS was a force majeure event, and therefore this provision required Cook to act in good faith and take all reasonable steps—including submitting to the VA audit—to help Acheron overcome that obstacle.

But the provision requires *the party affected* by a force majeure condition to use every reasonable effort to correct or eliminate the cause. Acheron contends both Cook and Acheron were "affected" by the VA's refusal to award an FSS, since this refusal prevented Acheron from performing which in turn prevented the object of the Agreement from being realized. However, every instance of a force majeure preventing one party from performing its obligations will "affect" both parties in the sense that it prevents the contract from being performed. Since the parties specifically chose to limit the obligation in the force majeure provision to "the party affected," we must assume they intended the party whose performance is *directly prevented* by the event. The plain language of the provision forecloses Acheron's argument to the contrary, without even reaching the question of whether "all reasonable steps" would include Cook submitting to the VA audit.

In short, the duty of good faith requires that a party perform its obligations and exercise its discretion under the contract in good faith. But it does not require a party to undertake a new, affirmative obligation that the party never agreed to undertake. No part of the Agreement, including the force majeure provision, obligates Cook to undergo an audit of its confidential sales records. As such, Cook did not breach the implied duty of good faith by refusing to do so.

### b. The Prevention Doctrine

Acheron also argues the common law prevention doctrine compels a decision in its favor. Indiana courts have recognized the prevention doctrine, under which a party's performance may be excused "where the other party wrongfully prevents that performance." *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 620 (Ind. Ct. App. 2000); *see also Stephenson v. Frazier*, 399 N.E.2d 794, 798 (Ind. Ct. App. 1980). The Indiana cases discussing this doctrine reveal two related applications: (1) a party who breaches a contract may not "take advantage of his breach to relieve him of his contractual obligations," *Rogier*, 734 N.E.2d at 620; *Stephenson*, 399 N.E.2d at 798, and (2) a party who prevents the fulfillment of a condition precedent on which that party's obligation was dependent may not rely on the failure of that condition to avoid its obligations, *Rogier*, 734 N.E.2d at 621. The Restatement (Second) of Contracts § 245 summarizes this doctrine as follows: "Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."

The prevention doctrine does not apply here for two reasons. First, this case does not involve a prevented condition precedent, because the Agreement does not explicitly state that Acheron's obtaining an FSS was a condition precedent to Cook's performance. A condition precedent is "a condition which must be satisfied before an agreement becomes enforceable or a condition which must be fulfilled before the duty to perform an already existing contract arises." *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 875 (Ind. Ct. App. 1991). Under Indiana law, conditions precedent are "generally disfavored and must be stated explicitly

within the contract." *Sasso v. Warsaw Orthopedic, Inc.*, 45 N.E.3d 835, 840 (Ind. Ct. App. 2015). Further, "[w]hen the required action to be taken is an integral part of the contract, it is not a condition precedent." *Id.* The Agreement does not explicitly condition its enforceability or any of Cook's obligations on the award of the FSS. Instead, Acheron's duty to obtain an FSS is an integral part of the Agreement. It is not a condition precedent.

Second, as explained in the previous section, Cook did not breach the Agreement by refusing to submit to the VA audit because it was not obligated to do so. Acheron's assertion that Cook "wrongfully prevented" Acheron from performing its obligation begs the question of Cook's obligation to submit to the audit. "The doctrine of prevention as an excuse for non-performance of a contractual duty is inapplicable when the conduct alleged to have prevented performance was permissible under the express or the implied terms of the contract." 13 Williston on Contracts § 39:11 (4th ed.). This conclusion is further supported by the comment to Restatement (Second) of Contracts § 245: "The rule stated in this Section only applies, however, where the lack of cooperation constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court." Acheron argues the duty of good faith provides the necessary "duty imposed by a term supplied by the court," but as we have already discussed, the duty of good faith does not suffice here.

This case does not present a scenario in which one party actively sought to sabotage the other party's performance to escape its own obligations or obtain an unfair advantage. Instead, the parties failed to come to an agreement about an

important aspect of the FSS approval process. We decline to infer an agreement on Cook's part to undergo the audit.

### c.  Compliance with Federal Regulations

Acheron next contends that applicable federal regulations obligated Cook to submit to the VA audit. As Acheron points out, unless a contract provides otherwise, "all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect." *Miller v. Geels*, 643 N.E.2d 922, 928 (Ind. Ct. App. 1994). Acheron additionally relies on what is known as the *Christian* doctrine, under which relevant federal regulations are incorporated as a matter of law into federal contracts.

When a reseller without significant sales to the general public petitions to obtain an FSS, the VA requires access to the manufacturer's commercial sales records to confirm its pricing. Accordingly, federal regulation requires such a reseller to obtain written authorization from the manufacturer for the VA to access the manufacturer's sales records. 48 CFR § 515.408(b)(5). The regulation also states the reseller "should advise the manufacturer(s) of this requirement." *Id.* Acheron argues this regulation was incorporated into the Agreement, creating an obligation on Cook to undergo the audit. For its part, Acheron sought and obtained a letter, signed by Walters, granting permission to the VA to access Cook's sales records. This letter did not amount to a valid amendment or modification of the Agreement. According to Acheron, however, since it fulfilled its obligation under § 515.408(b)(5) to obtain written permission, Cook was then obligated by the same regulation to honor the authorization letter and submit to the audit.

Regardless of whether Acheron properly sought written authorization, the regulation does not place any obligation on Cook to undergo the audit. As the district court correctly held, the regulation governs only the relationship between the reseller and the VA, not the manufacturer. If anything, the regulation's requirement that the reseller obtain written authorization and its recommendation that the reseller "advise the manufacturer" of the audit requirement emphasizes why Acheron should have ensured the Agreement expressly obligated Cook to provide access to its confidential sales records. Acheron did not do this, however, and the Agreement does not include any such obligation. Section 515.408(b)(5) does not suffice to imply one.

### d. Election of Remedies

Finally, Acheron argues Cook forfeited its right to terminate the Agreement by choosing to keep the contract in force, citing the "election-of-remedies" doctrine. Acheron also cites the equitable principles of waiver, estoppel, and modification to the same end.

Under the contractual election-of-remedies doctrine to which Acheron refers, when a breach by one party allows the non-breaching party to terminate the agreement, but the non-breaching party elects instead to continue accepting performance from the breaching party, then the non-breaching party has re-affirmed the contract and forfeits its right to terminate that contract. *See* Restatement (First) of Contracts § 309. Waiver comes into play where a party's conduct manifests an intent to waive a known right. *Ogle v. Wright*, 360 N.E.2d 240, 245 (Ind. Ct. App. 1977). Estoppel may be invoked when one party misleads the other party into believing a right will not be enforced, causing that party to act to his detriment.

*Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979). Finally, modification refers to parties mutually agreeing to modify their contract. *City of Indianapolis v. Twin Lakes Enters., Inc.*, 568 N.E.2d 1073, 1084 (Ind. Ct. App. 1991).

Soon after the VA denied Acheron's FSS petition, Walters sent an email to Acheron explaining Cook had decided not to submit to the VA audit. In that same email, Walters stated "the contract remains in place and we will continue to consider business opportunities with Acheron under the terms and conditions of that agreement." *Acheron Medical Supply Co.*, 2017 WL 4310163, at *5. The district court rejected Acheron's argument that this statement represented Cook's re-affirmance of the contract despite the breach. The court found that, without an FSS or DAPA sales, there was nothing left to be accomplished by the Agreement, and therefore Walter's statement that "the contract remains in place" was meaningless.

Acheron correctly points out the district court erred by concluding there was no longer any business to be conducted without an FSS. Walters testified in his deposition the contract could still govern transactions of business through other government contract vehicles and other forms of business with the VA. The FSS was only one contract vehicle through which the Agreement gave Acheron the right to resell Cook Medical's products, as seen on the Commission Schedule attached as Exhibit A to the Agreement. (District Court Docket 68-3, at 15.) Cook does not argue otherwise.

Furthermore, Cook improperly focuses its response on Indiana's *judicial* election-of-remedies doctrine, missing the point of Acheron's *contractual* election-of-remedies argument. Cook argues Indiana law allows a party to pursue separate

and contradictory claims in litigation so long as the party does not pursue one to completion and then pursue a subsequent, inconsistent remedy. *See Hoover v. Hearth & Home Design Ctr., Inc.*, 654 N.E.2d 744, 745 (Ind. 1995). That principle has no bearing on whether a party who has affirmed a contract despite the other party's breach and continued to accept performance may later reverse course and sue for breach. Acheron's argument raises the latter question.

However, the district court also pointed out Acheron's election-of-remedies argument relied solely on citations to non-Indiana cases and the Restatement of Contracts, without any authority demonstrating Indiana has adopted that doctrine (or to what extent it has done so). Acheron's principal brief acknowledges this part of the district court's holding yet still fails to provide any Indiana case law adopting or applying the doctrine. Acheron makes no argument why we, bound to apply Indiana law in this case, should assume Indiana follows this rule without any supporting case law.

In any event, there is no genuine dispute that Walters, merely a "sales account executive" at Cook, was not an officer with authority to speak or act on Cook's behalf. The record contains no support for the conclusion that Walters had the authority to bind Cook to a course of action, to affirm the contract, to modify the contract, or to waive Cook's right to terminate the contract. Accordingly, the district court properly rejected Acheron's argument that Cook affirmed the contract despite Acheron's breach, as well as its arguments for waiver, estoppel, and modification.

2.   Deactivation of Cook's DAPA

Acheron also argues Cook breached the Agreement by continuing to make direct sales to the DOD and refusing to deactivate its DAPA, inhibiting Acheron from making sales to the DOD through its own DAPA. The district court held this was not a breach, because the Agreement only appointed Acheron as an exclusive *agency* for DOD distribution and no term in the Agreement prevented Cook, the principal, from making *direct* sales. The court also noted the Agreement contemplated continued direct sales by providing for commissions to be paid to Acheron on these direct sales.

Acheron makes three main arguments on appeal. First, it argues Cook Medical is itself the distribution arm of its sister company, Cook Incorporated, and therefore Acheron's exclusive distributorship prevents Cook Medical from acting as a distributor of Cook Incorporated. Second, Acheron argues the district court misinterpreted the provision allowing Cook to continue making direct sales to the DOD, which is only permissible under limited circumstances. Finally, Acheron argues not implying an obligation on Cook to deactivate its DAPA effectively reads out of the contract Acheron's appointment as a distributor and denies Acheron the benefit of its bargain.

The argument that Cook Medical is itself a distributor is creative, but fails nonetheless. Acheron admits Cook Incorporated was not a signatory to the Agreement; Cook Medical was. All references in the Agreement to "COOK" refer to Cook Medical. Thus, regardless of the exact organizational relationships between the various arms of Cook's overall enterprise, the Agreement contemplates an exclusive agency through which Acheron is appointed as *Cook Medical*'s

exclusive distributor. Acheron's argument could only hold water if the Agreement appointed it as *Cook Incorporated*'s exclusive distributor. It does not.

Next, Acheron argues a proper interpretation of the Agreement only allowed Cook to make direct sales under limited circumstances. Those circumstances, according to Acheron, allowed direct sales to the VA on particular product lines while the parties awaited an FSS application for that product line to be approved. It was only those sales, Acheron contends, that Cook was permitted to make while the FSS approval process was ongoing and would entitle Acheron to a 3% commission.

This interpretation, however, is simply not supported by the plain language of the Agreement. The Agreement clearly allows Cook to make direct sales in "the Territory" (defined as including both the VA and the DOD) both during the anticipated FSS approval period (between March 1, 2014 and the end of 2014) as well as after an FSS was in place for the products being sold. (District Court Docket 1-1, at 5.) No language in the Agreement places the kinds of limits upon direct sales that Acheron argues it does. The district court correctly held the Agreement contemplates continued direct sales by Cook.

Finally, Acheron argues an obligation for Cook to deactivate its own DAPA must be implied, or else Acheron's appointment as Cook's distributor is rendered a nullity and Acheron is deprived of the benefit of its bargain. This is essentially the same argument we rejected regarding an implied duty for Cook to undergo the VA audit. Deactivation of Cook's DAPA to allow for sales through Acheron's DAPA was undoubtedly an important term the parties should have negotiated and included in their Agreement, but they did not.

Once again, as the party touting its experience and knowledge of government contracts, Acheron should have ensured Cook understood the need and agreed to deactivate its DAPA. The Agreement places no such obligation on Cook, but instead expressly allows for Cook to continue direct sales so long as a commission is paid.

Furthermore, the lack of an obligation on Cook to deactivate its DAPA does not render Acheron's appointment as exclusive distributor meaningless, nor does it deprive Acheron of the benefit of its bargain. Even without Cook deactivating its DAPA, Acheron would be able to distribute Cook's products to the VA and through other contract vehicles, and Acheron was also entitled to and did receive commissions for all of Cook's direct sales to the DOD. That was the benefit for which Acheron bargained, and the benefit it received.

In sum, the Agreement did not obligate Cook either to submit to the VA audit or deactivate its DAPA. The district court properly held Cook did not breach the Agreement, and therefore Acheron's failure to obtain an FSS was a material breach of the Agreement.

### 3.  Acheron's Liability

Having established Acheron breached the Agreement by failing to obtain an FSS, we turn to the final issue on appeal: whether Acheron owed damages for that breach. In its counterclaim against Acheron, Cook sought damages in the amount of the commissions it paid to Acheron for direct sales made to the VA during the period Acheron was seeking the FSS award. The district court held after the bench trial that Acheron's liability was excused by the Agreement's force majeure provision. The court also held the commissions were

paid to Acheron as consideration for Acheron's work in pursuit of the FSS award; they were not conditioned on Acheron's eventual procurement of an FSS. Cook appeals both holdings. Since we hold the force majeure provision completely absolves Acheron of liability for the breach, we do not need to address the second holding.

As explained previously, the Agreement's force majeure provision provides neither party

> shall be liable for any delay or default caused by force majeure, including, without limitation … act of government or … agency. The party affected by such a condition shall use every reasonable effort to correct or eliminate the cause which prevents performance and resume performance as soon as possible.

(District Court Docket 1-1, at 9.) Acheron's breach was undeniably caused by an act of a government agency (the VA's denial of the FSS award), and Acheron used every reasonable effort to correct or eliminate that cause (by attempting to obtain Cook's authorization for the audit, and by offering other sources of pricing information to the VA). Nevertheless, the force majeure remained.

Cook argues the denial of the FSS award due to Cook's refusal to submit to the VA audit was not a true force majeure because it was foreseeable (to Acheron, at least). Cook points to the fact that the applicable regulations and the VA website made clear that an audit would be necessary, and thus Acheron—the party touting its experience with and knowledge of the government contracts purchasing process—should have reasonably expected to encounter this roadblock, even though Cook did not.

But the question of whether *the audit* was foreseeable is ir-
relevant to the application of the force majeure provision. The
event that prevented Acheron from performing was not the
VA's request to complete an audit of Cook's sales records. Ra-
ther, it was *the VA's denial of the FSS award*, precipitated by
Cook's refusal to submit to the audit. Even if Acheron could
reasonably expect the VA would require a commercial sales
audit, that does not mean Acheron should have reasonably
foreseen circumstances would result in the VA denying the
FSS award. Thus, the VA's denial of the FSS qualifies as a force
majeure event outside both parties' anticipation[6] and cer-
tainly Acheron's control. The force majeure provision excuses
Acheron of any liability.

### III. Conclusion

In summary, the district court correctly held Cook had no
obligation to submit to the VA audit or deactivate its DAPA.
It also correctly held Acheron breached the Agreement by not
obtaining the FSS but was not liable for that breach due to the

---

[6] We further note the provision nowhere requires the force majeure
event be unforeseen, nor does it reference foreseeability at all. Cook cites
the definition of "force majeure" as an event that can be neither antici-
pated nor controlled, but the Indiana Court of Appeals has held "the scope
and effect of a force majeure clause depends on the specific contract lan-
guage, and not on any traditional definition of the term." *Specialty Foods of
Indiana, Inc. v. City of South Bend*, 997 N.E.2d 23, 27 (Ind. Ct. App. 2013). In
that case, the court held a force majeure clause "contain[ing] nothing
about foreseeability" was intended to apply regardless of whether the par-
ties could have reasonably foreseen the event that precluded performance.
*Id.* at 27. However, because we hold the force majeure provision applies
even assuming the event had to be unforeseen, we need not analyze fur-
ther whether the force majeure in this case required foreseeability.

force majeure provision. Accordingly, the judgment of the district court is AFFIRMED.