In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 21-2007

THOMAS BARWIN,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF OAK PARK,

*Defendant-Appellee.*

―――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-06046 — **Mary M. Rowland**, *Judge.*

―――――――――

ARGUED DECEMBER 7, 2021 — DECIDED NOVEMBER 22, 2022

―――――――――

Before ROVNER, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges*.

ROVNER, *Circuit Judge*. This diversity case presents questions concerning the contractual rights of an at-will village manager, Thomas Barwin, who resigned under threat of termination two and one-half years before his pension rights vested. Barwin alleges that his former employer, the Village of Oak Park, Illinois, breached its contractual duty of good faith and fair dealing in two ways: first, by forcing him out of

his job in order to prevent his pension from vesting, and second, by refusing to honor its practice of allowing senior employees to purchase out-of-state pension credits in order to meet the vesting threshold. We agree with the district court that Barwin has no plausible contract claim for breach of the duty of good faith and fair dealing based on an expectation that the Village would not fire him or force him to resign in order to prevent him from reaching retirement eligibility, and so that claim was properly dismissed at the pleading stage. As an at-will employee, Barwin had no enforceable expectation that he would remain employed long enough to meet the vesting threshold. However, we conclude that the district court erred in entering summary judgment against Barwin on the claim that his employer breached its duty of good faith and fair dealing by not allowing him to purchase out-of-state pension credits as it had historically done with other employees. His employment contract entitled him to the same benefits that other senior employees of the Village enjoyed "by practice," and based on the facts presented, a finder of fact could reasonably conclude that the Village had a practice of allowing such employees to purchase out-of-state pension credits.

## I.

Oak Park recruited Barwin to serve as its village manager in 2006. (He previously worked as a city manager in Michigan.) He was employed by Oak Park on an at-will basis; in other words, he was hired for no particular term and his employment agreement imposed no restrictions on the Village's ability to replace him at any time. Barwin was around 50 years old at the time of his hiring, and he was concerned about his prospective retirement income. The parties agreed that

Barwin would participate in the Illinois Municipal Retirement Fund (the "IMRF" or "Retirement Fund") and that they would each make contributions to that Retirement Fund, but it would be eight years before his pension rights vested under that system, *see* 40 ILCS 5/7-141(a)(4), and because Barwin was hired as at an-will employee, he had no guarantee that he would be employed with the Village for that length of time. Barwin alleges that he raised his concern with Village President David Pope, who assured him that if he left his position with the Village before the eight-year threshold, he would be able to purchase reciprocal out-of-state pension credits that would satisfy the 8-year minimum. *See* 40 ILCS 5/7-139(a)(6).[1] Any such request would require the approval of the Village Board of Trustees, which was Oak Park's governing body. *See id.* Pope advised Barwin that the Village had granted such a request from the previous Village manager, who had likewise been recruited from out of state. Following his discussion with Pope, Barwin looked into the matter and independently confirmed what Pope had told him. R. 94 at 1–2 ¶ 2, 8–9 ¶ 21. Indeed, a total of at least five Village employees (including Barwin's predecessor) had made requests to purchase out-of-state pension credits, and the requests of all five had been granted. R. 94 at 9 ¶ 22.[2]

---

[1] In order to purchase such credits, an individual must have worked for an Illinois municipality for a minimum of two years, previously worked for an out-of-state local governing body and participated in that body's public employee pension system, and he must agree to forfeit his right to obtain a pension under that other State's system. 40 ILCS 5/7-139(a)(6).

[2] There may have been additional individuals who were authorized to purchase such credits. Five is the number alleged in the complaint, and which the Village has in turn admitted, but Barwin did not seek to

The terms of Barwin's employment were memorialized in a written employment agreement. Section 7 of the agreement provided that Barwin would become a member of the IMRF and that both he and the Village would make the requisite contributions to that Retirement Fund. R. 44-1 at 2, § 7. However, the agreement did not say anything about Barwin's right to purchase out-of-state pension credits. Moreover, the agreement contained an integration clause which expressly provided that:

> This Agreement sets forth and establishes the entire understanding between the Employer and the Employee relating to the employment of the Employee by the Employer. Any prior discussions or representations by or between the Employer and the Employee not specifically stated in this Agreement are rendered null and void by this Agreement. …

R. 44-1 at 8, § 21A. In short, there was no express promise that Barwin would be able to purchase pension credits in the event he needed them, and the agreement's integration clause precluded resort to extrinsic evidence in order to establish such a promise.

There is, however, another provision of the agreement that has a bearing on this question. Section 19 of the agreement, setting forth "Other Terms and Conditions of Employment," provided in relevant part that "the Employee shall be entitled to the highest level of benefits that are enjoyed by other department heads or equivalent-level employees of the

---

determine in discovery whether there were additional instances of such purchases. *See* Barwin Br. 42–43.

Employer as provided in the Oak Park Village Code, Personnel Rules and Regulations or *by practice*." R. 44-1 at 7, § 19A (emphasis supplied).[3] As discussed in greater detail below, Barwin argues that because it was the Village's historical practice to grant employee requests for out-of-state pension credits, he had a contractual right and expectation to be able to purchase such credits under this provision of the contract.

Finally, pursuant to section 21A of the agreement, the parties reserved the right to amend any provision of the contract during its lifetime by mutual agreement. R. 44-1 at 8, § 21A. The agreement was in fact amended by the parties on occasion, most recently in June 2011, some eight or nine months prior the events giving rise to this suit. *See* Barwin Aff. ¶¶ 5–6, R. 141-2 at 3.

Barwin served as the Oak Park Village Manager for five and a half years, from June 2006 until February 2012, when he resigned under threat of termination. Barwin touts a number of accomplishments as Manager and substantial satisfaction among Oak Park residents with Village services during his tenure, and the Village Board itself was apparently satisfied in the main with his performance until early 2012, when the Board undertook his annual evaluation for 2011. A previous mid-year review finalized in November 2010, although noting areas of strength in Barwin's track record, had flagged several aspects of Village operations and Barwin's performance that were of ongoing concern to the Trustees, R. 138-4,

---

[3] This section of the contract was patterned after a similar provision in a 2003 model employment agreement promulgated by the International City/County Management Association, of which Barwin was a member. R. 138-6 at 13, § 19A; *see* Barwin Dep. 8-11-2020 at 52, R. 138-5 at 8.

and Barwin himself would later acknowledge that he understood this review of his performance to have been "mixed." Barwin Dep. Feb. 14, 2019 at 68, R. 138-2 at 15. The Board did not undertake a mid-year review of Barwin's work in 2011. In early 2012, the Board members individually completed annual-review forms rating Barwin's performance in 2011, and Barwin prepared a written assessment of his own. On February 13, 2012, the Village President and the other members of the Board of Trustees met in closed session to discuss the results, having excluded Barwin, the Village legal counsel, and the Village Clerk from the meeting. The meeting was recorded and later transcribed. R. 138-3. The collated ratings of Barwin's performance submitted by the Board members indicated continuing dissatisfaction in a number of areas, and several members of the Board indicated frustration that Barwin's own positive written assessment of his performance diverged from their own in these areas.

During this discussion, the subject of Barwin's eligibility for retirement came up. One of the Trustees understood a passage in Barwin's self-assessment concerning the completion of his public service career to mean that Barwin hoped to continue as Village Manager for several more years and then retire. The Trustee remarked, "It was like he was saying, give me the three years and then I'll be done." R. 138-3 at 9. To which another Trustee responded, "If you've been here for twelve years, then you can do that … but you can't do that when you've been here for five. You can't. Can't afford it." R. 138-3 at 9.[4] That prompted a brief exchange as to when

---

[4] The ellipsis appears in the transcript of the meeting. The record does not reflect whether it is meant to signify a deletion from the Trustee's remarks or merely a pause.

Barwin would be eligible to retire and whether, in lieu of him reaching the eight-year vesting threshold, Barwin had obtained reciprocal credits for his Michigan service with the IMRF or was otherwise eligible for a Michigan pension—as to which Village President Pope professed ignorance. R. 138-3 at 9.[5]

After discussing their assessments of Barwin, the evident consensus among all seven members of the Board, including Village President Pope, was that the time had come for a change of Village Manager. On the following day, Pope and a Trustee (both of whom were members of the Village's Personnel Committee) met privately with Barwin and presented him with a choice: resign as Village Manager or face an official Board vote to terminate him.[6] In the interim between the

---

[5] The parties dispute what inferences can be drawn from this discussion, including whether the remark "Can't afford it" should be understood to mean that Barwin could not afford to assume that he would continue in the Village's employ until he reached pension eligibility (as the Village argues) or that the Village could not afford the financial burden that it would incur should Barwin attain pension eligibility. For purposes of the issues raised in this appeal, and consistent with the allegations that Barwin has made in his complaint, we shall assume that the latter interpretation is the correct one.

[6] Barwin's complaint has cited a number of circumstances surrounding the February 13 meeting of the Board of Trustees and the follow-up meeting with Barwin the next day—including the closed nature of the meetings, the exclusion of legal counsel and other individuals, the lack of public notice, the lack of official record-keeping, and the Trustees' use of personal email accounts to communicate about the decision to oust Barwin from the Village Manager post—as contrary to Village practice and the Illinois Open Meetings Act, 5 ILCS 120/1, *et seq.*, and as evidence of the Village's bad faith in deciding to force his resignation. Although, as discussed below, the Village admitted the factual allegations of the complaint

receipt of his mid-year evaluation in November 2010 and this meeting on February 14, 2012, no member of the Board had communicated a complaint or criticism to Barwin regarding his performance nor had the Personnel Committee met with him to advise him of any such concern.

Presented with the ultimatum to resign or be fired, Barwin opted to resign. The Village granted him severance pay equal to nine months of his salary pursuant to the Termination and Severance provisions of the employment contract. R. 44-1 at 4–5 §§ 9–10. The Village also offered to grant him additional severance benefits in exchange for a waiver of all claims against the Village, but Barwin declined the offer.

At the time of his resignation, Barwin was still two and a half years shy of the eight-year vesting threshold for his Illinois pension. After he communicated his decision to resign but while he was still within the Village's employ (*see* Barwin Dep. Feb. 14, 2019 at 136, 139, R. 125-3 at 25–26; Barwin Aff. ¶ 4, R. 141-2 at 2), Barwin asked Village President Pope if he would be given permission to purchase out-of-state pension

---

by failing to file a timely answer, any legal issues raised by the complaint are for the court to decide irrespective of the Village's failure to timely answer the complaint. *See* 10A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2688.1 & n. 11 (4th ed. 2016) ("a party in default does not admit conclusions of law"). For its part, the Village denies any impropriety and contends that the Board of Trustees convened in executive session to discuss Barwin's performance and likewise communicated its decision to replace him in private in order to protect his confidentiality and preserve his future employment prospects. Had Barwin refused to resign, the Village represents that the Board of Trustees would have convened in a public meeting to vote on whether to terminate him. Because the propriety of the form of the meetings on February 13 and 14 do not affect our evaluation of Barwin's two contract claims, we need not consider the issue.

credits in order to bring himself up to the eight-year vesting minimum. Pope said he would take the request to the Village Board, but he did not do so, and the Village Board of Trustees never took a vote on whether to authorize Barwin to purchase the credits. R. 94 at 4–5 ¶ 9, 14–15 ¶ 38. As a result, Barwin was unable to purchase the credits and thus did not satisfy the eight-year vesting threshold for pension eligibility.[7]

Barwin filed suit in diversity (he is now a citizen of Florida[8]) against the Village for breach of contract. The district judge originally assigned to the case dismissed Barwin's original complaint with prejudice (R. 19) but later granted (R. 39) his request for leave to file a first amended complaint, which alleged that the Village breached the implied covenant of good faith and fair dealing by interfering with Barwin's expectation that the Village would not fire him (or force him to resign) in order to prevent him from reaching the eight-year vesting threshold for pension benefits (R. 44). The Village again moved to dismiss, and the district court, following assignment of the case to a new judge, again granted the

---

[7] Barwin could have made his request to purchase the out-of-state credits at any point after he had been in the Village's employ for two years, but he did not do so until he was forced to resign. Barwin explained that he had not done so previously because, given the financial burden of having multiple children in college, he was attempting to "narrow th[e] gap" between his years of actual work for the Village and the eight years required for pension vesting (and thereby reduce the cost of purchasing the necessary credits). Barwin Dep. Feb. 14, 2019 at 135, R. 125-3 at 24. As we discuss below, we are not persuaded that the timing of Barwin's request defeats his claim for breach of contract regarding his ability to purchase the credits.

[8] Following his departure from Oak Park, Barwin was hired as the city manager of Sarasota, Florida.

Village's motion. R. 91. The court acknowledged that although Barwin was an at-will employee, the Village was nonetheless constrained by the implied duty of good faith and fair dealing. R. 91 at 9, 11. But the court found nothing in the agreement that guaranteed Barwin a pension or required the Village to keep Barwin in its employ until such time as his pension vested. R. 91 at 11. Further, although Illinois cases do recognize that an employer may violate the duty of good faith and fair dealing by taking action with an "improper motive," for example by discharging an employee in order to prevent him from receiving benefits that he had already earned (R. 91 at 12), the allegations in this case did not fit that profile. Here, the Village fired Barwin two and one-half years before he met the pension-vesting threshold, and "there is no contract language indicating that Barwin is entitled to his pension benefits two and half years before it vests." R. 91 at 13. In short, Barwin had not alleged a plausible claim for breach of the covenant of good faith and fair dealing.

The district court did, however, grant Barwin leave to file a second amended complaint alleging that the Village, in refusing to allow him to purchase pension credits, breached the duty of good faith and fair dealing by interfering with his right under section 19A of the agreement to the "highest level of benefits" enjoyed by other department heads and comparable employees "by practice." Barwin's theory was that the Village had historically and uniformly allowed other senior employees to purchase pension credits, that such employees included the Village Manager who preceded Barwin, and that Pope had assured Barwin he would be able to purchase such credits if he did not attain enough years of service in order to meet the vesting criteria. The court deemed it a "close call" whether the new complaint presented a viable claim for

breach of the duty of good faith and fair dealing (R. 91 at 19), but it determined that the facts alleged supported a reasonable expectation that Barwin would be able to purchase pension credits if needed, and that the Village Board had acted arbitrarily and with an improper motive in refusing to allow him to do so (R. 91 at 19–20).

The Village neglected to file a timely answer to Barwin's second amended complaint and did not seek leave to file such an answer until eight months after the district court authorized Barwin to file the complaint. After some sparring over this issue, the court ultimately denied the Village's belated request to file an answer (R. 136) and as a result it deemed the Village to have admitted the factual allegations of that complaint, *see* Fed. R. Civ. P. 8(b)(6).

When the parties subsequently filed cross-motions for summary judgment on this claim, the district court granted the Village's motion and denied Barwin's motion. R. 145. The court agreed with the Village that section 19A of the agreement did not grant Barwin a right to purchase additional pension credits, because the evidence did not support the notion that there actually was a Village practice of allowing senior employees to do so. The court agreed with the parties that the term "practice" should be understood to mean "repeated or customary action" or the "usual way of doing something" (R. 145 at 8–9), but it also read the contract's reference to rights that "are enjoyed" "by practice" to "limit[ ] the span of time that a reasonable reader may examine in order to determine the 'practice'" (R. 145 at 8). Here, the evidence indicated that over a course of multiple decades, some five Oak Park employees had been permitted to purchase out-of-state pension credits, but the last known date for such a purchase was 2001,

five years before Barwin was hired and 11 years prior to his resignation.

On these facts, the court concluded that no factfinder could reasonably find that there was an established "practice" of allowing employees to purchase such credits. R. 145 at 9. This was so notwithstanding the absence of evidence that such a request had ever been refused, and despite evidence that the prior Village Manager himself (among other employees) had been allowed to make such a purchase.

The court reasoned further that this reading of "practice" was consistent with a principle of Illinois law holding that elected officials should not be bound by their predecessors' decisions as to the welfare of the political subdivision they govern. R. 145 at 9–10. *See Grassini v. DuPage Twp.*, 665 N.E.2d 860, 864–65 (Ill. App. Ct. 1996) (deeming four-year contract for employment of township administrator void *ab initio* because the term of the contract extended beyond term of township board and supervisor who approved it).

The court added that although Barwin pointed to Village President Pope's oral assurances at the time of his hiring that the Village had allowed Barwin's predecessor to purchase out-of-state pension credits and that Barwin would be permitted to do the same if the need arose, the agreement's integration clause prevented the court from considering any such promise or representation. R. 145 at 10–11.

In the absence of evidence sufficient to establish a practice of allowing senior employees to purchase pension credits, the court found that Barwin had no reasonable expectation under section 19A of the employment agreement of having his own request granted. Accordingly, the court found no need to

reach the question of whether the Village breached its duty of good faith in declining to consider and grant his request. R. 145 at 10, 15–16. The court found the additional allegations of irregularities concerning the meeting where the decision to discharge Barwin was made to be immaterial to his claim. R. 145 at 12 & n.13.

Finally, the court rejected Barwin's argument that the court was violating the law of the case doctrine by retreating from its prior analysis in allowing him to file his second amended complaint. "The Court's decision to allow an amended complaint under Fed. R. Civ. P. 15 in no way guarantees success on the merits. Although the Court found Barwin alleged a plausible theory of liability in his proposed [Second Amended Complaint] and the facts in that Complaint have been admitted, the legal conclusions in that SAC were not admitted." R. 145 at 12.

## II.

Barwin contends on appeal that he has a valid claim for breach of contract against the Village under either of two theories. First, he posits that under the terms of his employment agreement, which obligated both parties to make pension contributions to the IMRF, he had a reasonable expectation that he would attain eligibility for a pension and that the Village breached its contractual duty of good faith and fair dealing when it decided to force his resignation in order to preclude him from reaching the eight-year pension-vesting threshold. Second, he contends that because the agreement granted him such benefits as were enjoyed by senior employees "by practice" and the Village had a cognizable "practice" of allowing such employees to purchase out-of-state pension credits, the Village breached the duty of good faith and fair

dealing by refusing to abide by that practice and approve his own request to purchase such credits. For the reasons that follow, we affirm the district court's decision to dismiss, for failure to state a claim, the first amended complaint which set forth the first claim challenging the Village's decision to oust him as Village Manager. But we reverse the court's decision to grant summary judgment as to the second claim regarding his asserted right, as a matter of Village practice, to purchase out-of-state pension credits.

A. *Good faith and fair dealing: reaching the pension-vesting threshold.*

As the foregoing discussion reveals, there are two breach-of-contract claims at issue in this appeal, both based on the duty of good faith and fair dealing: one that was dismissed at the pleading stage, and one that was resolved against Barwin at the summary judgment stage.

The claim that was dismissed at the pleading stage was the claim in the First Amended Complaint that the Village forced Barwin out as the Village Manager under threat of termination in order to prevent him from reaching the pension-vesting threshold. The agreement obligated the Village and Barwin both to make regular contributions to the IMRF and, in view of that provision, Barwin alleged that he had an expectation that his pension would eventually vest and, more specifically, that the Village, notwithstanding its broad discretion over his continuing employment, would not exercise that discretion in an opportunistic way so as to prevent him from reaching pension eligibility.[9]

---

[9] Although both of Barwin's contractual claims implicate his right to a pension, we note that the Employee Retirement Income Security Act of

We review *de novo* the district court's decision to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief might be granted. *E.g.*, *Dean v. Nat'l Prod. Workers Union Severance Trust Plan*, 46 F.4th 535, 543 (7th Cir. 2022). To survive a motion to dismiss, a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim satisfies that criterion when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). We accept as true all well-pled facts alleged in the complaint. *E.g.*, *Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 814 (7th Cir. 2019). Barwin attached his employment agreement to the complaint, and consequently we deem the contract to be part of the pleading, Fed. R. Civ. P. 10(c), and we may consider the provisions of that contract in evaluating the sufficiency of the complaint. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639–40 (7th Cir. 2015); *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007).

The parties agree that Illinois law governs Barwin's claims, and because the employment agreement between Barwin and the Village did not specify a duration of employment or otherwise impose conditions on the Village's ability to

_____

1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, does not come into play here, because ERISA expressly exempts from its coverage any "governmental plan," 29 U.S.C. § 1003(b)(1), and such a plan is defined to include a plan established by a State or any political subdivision thereof, § 1002(32).

discharge Barwin, he was an at-will employee under Illinois law. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 687 (7th Cir. 2014); *Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 586 (7th Cir. 2015), *overruled on other grounds by LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384, 387–89 (7th Cir. 2019); *Robinson v. BDO Seidman, LLP*, 854 N.E.2d 767, 770 (Ill. App. Ct. 2006).[10] As a result, the Village was free to discharge him for a good reason, a bad reason, or on a whim. *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 674 (7th Cir. 2013) (Darrow, J., concurring) ("An employer can terminate an at-will employee for almost any reason."); *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 567 (7th Cir. 1991) ("as an at-will employee, LaScola could be discharged for any reason—good or bad"); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) ("An [at-will] employer may be thoughtless, nasty, and mistaken."); *Robinson*, 854 N.E.2d at 770 ("an employee at will may be discharged for any reason or no reason at all"). The freedom was not one-sided: as an at-will employee, Barwin himself was free to terminate his relationship with the Village for any reason without breaching his employment contract. *Id.*; *Stevenson v. ITT Harper, Inc.*, 366 N.E.2d 561, 566 (Ill. App. Ct. 1977).[11]

---

[10] Unless otherwise indicated, all federal cases cited in this opinion applied Illinois law.

[11] Illinois does recognize a narrow limitation on an employer's otherwise unbounded discretion to discharge an at-will employee, allowing such an employee to pursue a claim of retaliatory discharge when he has been terminated in violation of public policy. *See Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009); *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878–79 (Ill. 1981). There is no contention that Barwin's discharge might support such a claim. Federal and state anti-discrimination statutes, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the

A duty of good faith and fair dealing is implied into every Illinois contract. *LaScola*, 946 F.2d at 565 (citing *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 589 (7th Cir. 1989), *abrogated on other grounds by Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 116 S. Ct. 2342 (1996)); *Jordan*, 815 F.2d at 438. As relevant here, that obligation precludes an employer from making an "avowedly opportunistic" decision to discharge an at-will employee. *See Jordan*, 815 F.2d at 438; *LaScola*, 956 F.2d at 566. But the obligation is not a source of rights independent of the parties' contract, nor does the duty supply a discharged employee with a separate cause of action against his former employer. Instead, the duty of good faith and fair dealing functions as an interpretive aid, ensuring that the employer, as "a party vested with contractual discretion [in this case, to discharge its employee for virtually any reason] to exercise [that discretion] reasonably, and not arbitrarily or capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Reserve at Woodstock, LLC v. City of Woodstock*, 958 N.E.2d 1100, 1112 (Ill. App. Ct. 2011); *see also Wilson*, 729 F.3d at 674 (Darrow, J. concurring); *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 769 (N.D. Ill. 2019); *Zewde v. Elgin Cmty. Coll.*, 601 F. Supp. 1237, 1250 (N.D. Ill. 1984); *Gordon v. Matthew Bender & Co.*, 562 F. Supp. 1286, 1289–90 (N.D. Ill. 1983).

Thus, "[w]here a party acts with improper motive, be it a desire to extricate itself from a contractual obligation to bring

---

Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.*, also apply to at-will employees. *See Carter Coal Co. v. Human Rights Com'n*, 633 N.E.2d 202, 207 (Ill. App. Ct. 1994). Barwin has not alleged that he was discharged in violation of any such statutory protections.

about a condition precedent or a desire to deprive an employee of reasonably anticipated benefits through termination, that party is exercising contractual discretion in a manner inconsistent with the reasonable expectations of the parties and therefore is acting in bad faith." *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 991 (Ill. App. Ct. 1984). So, for example, if an employment agreement provides that an at-will employee is entitled to a commission under specified conditions, and those triggering conditions have been met, the employer may not evade its obligation to pay the commission by exercising its otherwise wide discretion to fire the employee before the date payment is due: that would constitute avowedly opportunistic behavior. *Jordan*, 815 F.2d at 438–39; *see also Wilson*, 729 F.3d at 67–75 (Darrow, J., concurring); *id.* at 681 (Hamilton, J., concurring in part and dissenting in part); *La-Scola*, 946 F.2d at 566; *McCleary v. Wells Fargo Sec., L.L.C.*, 29 N.E.3d 1087, 1093–95 (Ill. App. Ct. 2015) (plaintiff adequately alleged that his employer breached duty of good faith and fair dealing by unilaterally altering terms of bonus plan in order to deny him eligibility after he had already met former criteria for bonus); *Reserve at Woodstock*, 958 N.E.2d at 1113–14 (city violated duty of good faith and fair dealing it owed to developer under annexation agreement by exercising its discretion to re-zone property for agricultural use and blocking proposed development, after developer had already expended hundreds of thousands of dollars and essentially complied with all criteria to proceed with development).

But apart from ensuring that the employer does not take undue advantage of an at-will employee by acting contrary to the terms of the employment agreement, the duty of good faith and fair dealing does not require that the employer have cause to discharge the employee nor does it otherwise limit

the employer's duty to let the employee go for whatever rea-
son: the employer retains its otherwise unfettered ability to
terminate its relationship with the at-will employee for any
reason, good or bad. *See Jordan*, 815 F.2d at 438; *Gordon*, 562
F. Supp. at 1289–90; *Wilson*, 729 F.3d at 688 (Wood, J., concur-
ring in part and dissenting in part).

Barwin's theory, as we have said, is that the duty of good
faith and fair dealing, in view of the employment agreement's
provision for payments toward his pension eligibility, barred
the Village from exercising its discretion to oust him from the
Village Manager role in order to interfere with his pension
rights. Drawing from the transcript of the Village Board meet-
ing where the decision was made to replace him, Barwin al-
leges that the Board decided to oust him so as to avoid incur-
ring the expense of paying him a pension. The complaint
highlights the remark by a Trustee to the effect that Barwin,
having only held the position of Village Manager for five and
a half years, could not assume that he would continue in that
position until he reached pension eligibility, concluding with
the observation, "Can't afford it." Barwin alleges that this re-
mark was meant to convey the notion that the Village could
not afford to have him become eligible for a pension. That
may not be the only reasonable way to interpret the remark,
but it is one plausible construction, and because this claim
was dismissed at the pleading stage, we accept the truth of
this allegation.[12] Consistent with that allegation, Barwin has

---

[12] As we noted above, the actual remarks of the Village official as tran-
scribed are ambiguous as to whether the Trustee was referring to the Vil-
lage's ability to afford Barwin reaching pension eligibility or Barwin's abil-
ity to assume that he would remain employed until he reached the eligi-
bility threshold, and the parties dispute what significance we should at-
tach to those remarks. *See supra* n.5. But given that we are evaluating the

separately alleged that Pope had previously made remarks to him over the course of his tenure regarding the cost of employee pensions. R. 94 at 12 ¶ 34. We can therefore assume, in assessing the viability of this claim, that the Village Board indeed did decide to demand his resignation under threat of discharge in whole or in part to prevent his pension from vesting and thus to avoid the corresponding financial obligation. Even so, we agree with the district court that the complaint does not state a plausible claim for breach of the contractual duty of good faith and fair dealing.

Whatever else the contract provided, it did not state that the Village and Barwin were agreeing to a minimum employment term of eight years; had that been the case, Barwin would not have been an at-will employee. True enough, the agreement obligated both Barwin and the Village to make contributions to the municipal pension fund, a necessary but not sufficient condition on his eventual eligibility to receive a pension. From Barwin's perspective, that obligation only makes sense if the parties intended for him to serve as Village Manager until such time as his pension rights vested. Put another way, in agreeing that Barwin would participate in the IMRF and that both parties would make periodic contributions to the Retirement Fund, the Village, in Barwin's view, implicitly agreed not to weigh the costs of his prospective pension in exercising its otherwise unfettered discretion to replace him as Village Manager at any time. But we do not think that provision of the contract can bear the weight Barwin places upon it. The parties agreed to make contributions to

_____

dismissal of this claim at the pleading stage, and our focus is necessarily confined to the four corners of the complaint, we shall set aside the ambiguity in the transcript (which is not attached to the complaint).

the IMRF toward Barwin's eventual pension eligibility, but no more. It is by no means unusual for an employee to quit or be discharged before his pension rights vest, and that does not render worthless any prior pension contributions made on his behalf. Had Barwin obtained employment with another Illinois municipality participating in the IMRF, his years of service with Oak Park and the contributions made during that time would have continued to count toward his pension eligibility, and he might have reached the 8-year vesting threshold in his new position.[13] We also understand from the parties that Barwin had a right to request a refund of the contributions he had made to the IMRF, and for its part the Village could allocate the contributions it had made for Barwin to its other pension obligations.[14] So the contributions were not rendered pointless with Barwin's ouster, and we do not read the provision dictating that the parties make such contributions as reflecting a shared expectation, let alone commitment, that Barwin would continue in the Village Manager position long enough for his pension rights to vest.

That being the case, the duty of good faith and fair dealing did not preclude the Village from discharging Barwin even if it did so in whole or in part because it did not want him to become eligible for a municipal pension and for the Village coffers to incur the substantial cost of that pension. This case is not analogous to the earned-benefit cases, given that the triggering event for Barwin's pension eligibility had not yet

---

[13] Indeed, Barwin testified at his deposition that he made unsuccessful efforts to find a job with another Illinois municipality. Barwin Dep. Feb. 14, 2019 at 140, R. 125-3 at 27.

[14] *See* Barwin post-argument memorandum at 1–2, 7th Cir. docket No. 34 (Dec. 21, 2021).

come to pass and, in fact, was still two and a half years away. *See Criscione v. Sears, Roebuck & Co.*, 384 N.E.2d 91, 94 (Ill. App. Ct. 1978) ("Plaintiff's complaint alleges only that pension benefits had accrued during [his] 10 years at Sears and that the benefits were lost as a result of his dismissal. There is no allegation regarding agreements pertaining to pension benefits or that his rights to the benefits had vested."); *Stevenson*, 366 N.E.2d at 566 (where employment agreement provided that company would pay an annual pension to plaintiff in event he remained in company's employ until he reached age of 65, there was no undertaking by company to retain employee's services until he reached age of 65 or for any other period: "Terminating of the employment relationship was and remained the exclusive privilege of the employer precisely as plaintiff retained the concurrent right to leave the company."). Even if we assume *arguendo* that the duty of good faith might foreclose the Village from firing Barwin on the eve of the vesting threshold in order to keep him from earning a pension, *cf. K Mart Corp. v. Ponsock*, 732 P.2d 1364, 1370 (Nev. 1987) (recognizing tort claim for bad faith discharge decision made by large nationwide employer to prevent employee from claiming contractual retirement benefits which were six months away from becoming 100 percent vested), *abrogated by Ingersoll-Rand Corp. v. McClendon*, 498 U.S. 133, 111 S. Ct. 478 (1990) (holding that ERISA preempts state-law claims relating to private benefit plans, including common law wrongful discharge claims premised on employer's desire to avoid making contributions to pension fund on employee's behalf); *Hurst v. IHC Health Servs., Inc.*, 817 F. Supp. 2d 1202, 1208 (D. Id. 2011) ("The paradigmatic example of a breach of the covenant is where an employer terminates an at-will employee weeks before the employee's retirement vests in order to avoid paying

the employee's retirement benefits; although the employment contract permits termination without cause, termination to avoid paying benefits due the employee would amount to a breach.") (Idaho law); *Stevenson*, 366 N.E.2d at 567 (noting that duty of good faith did not assist plaintiff "because the record does not suggest that plaintiff's termination was a bad faith effort by ITT Harper to avoid its conditional duty to pay pension benefits"),[15] two and a half years short of the vesting threshold does not qualify as the eleventh hour. And at a

_____

[15] Barwin cites the Illinois Appellate Court's decision in *Stevenson* for the proposition that discharging an employee in order to prevent his pension rights from vesting violates the covenant of good faith and fair dealing, regardless of whether the vesting threshold is imminent. But the passage we have quoted from *Stevenson*, which rejected such a claim based on a factual determination that the employer had not let the plaintiff go in order to escape its conditional obligation to pay pension benefits, constitutes nearly the entirety of the court's analysis. Barwin presumes that had the court found that the plaintiff *was* discharged in order to avoid paying him a pension, the court would have concluded that the employer breached the duty of good faith and fair dealing. We agree it is possible that the *Stevenson* court might have come to that conclusion, but given the brevity of the court's analysis, we are not convinced that such an outcome was certain or even likely. It is not unusual for a court to reject a particular claim on the ground that the factual premise of the claim has not been established, without addressing the legal merits of the claim.

substantial remove from that hour, the Village was free to make a decision that it deemed to be in its own economic self-interest, however detrimental that was to its at-will employee and however unfair or distasteful that decision might seem. *See Wilson*, 729 F.3d at 688 (Wood, J., concurring in part and dissenting in part) ("Opportunism exists only if one side has sunk costs that cannot be recovered by the time the other side acts[.]"); *Rodio v. R.J. Reynolds Tobacco Co.*, 416 F. Supp. 2d 224, 235 (D. Mass. 2006) ("The implied covenant of good faith and fair dealing 'does not protect interests contingent on an event that has not occurred,' such as continued employment.") (quoting *Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 631 (Mass. 2001)) (Massachusetts law); *Wagenseller v. Scottsdale Mem. Hosp.*, 710 P.2d 1025, 1040 (Ariz. 1985) ("The covenant does protect an employee from a discharge based on an employer's desire to avoid the payment of benefits already earned by an employee, … but not the tenure required to earn … pension and retirement benefits … ."), *superseded in other respects by* Ariz. Rev. Stat. § 23-1501, *et seq.*; *accord*, *Metcalf v. Intermountain Gas Co.*, 778 P.2d 744, 749 (Id. 1989), *modified in other respects by Sorensen v. Comm Tek, Inc.*, 799 P.2d 70, 75 (Id. 1990). It would be no different had the employment agreement specified a pay increase for each additional year that Barwin worked for the Village: at some point, the Village might have concluded that it was in its interest to let Barwin go and replace him with a more modestly compensated employee. *See Edwards v. Mass. Mut. Life Ins. Co.*, 936 F.2d 289, 292 (7th Cir. 1991) (Mass. law). This is the nature, and some might say the point, of at-will employment: the employer is free to discharge the employee even on a rationale that a reasonable observer might find unfair. As Judge Wood observed in *Wilson* with respect to the doctrine of at-will employment,

"Some people might not mourn its passing, but it is firmly entrenched in Illinois law, and it is our duty to follow Illinois in this respect." *Id.*

In short, construing the duty of good faith and fair dealing to limit the Village's discretion as to Barwin's continued employment—even if only to require that it be blind to the costs of his prospective pension—cannot be reconciled with his status as an at-will employee. For better or worse, the at-will doctrine remains a feature of Illinois law, and short of a contractual obligation to continue employing Barwin until his pension rights vested, the Village remained free, with the vesting threshold more than two years off, to discharge him even if solely to prevent him from reaching that threshold.

B. *Good faith and fair dealing: purchase of out-of-state pension credits.*

Barwin's second good faith and fair dealing claim—this one asserted in the Second Amended Complaint and allowed by the court to proceed beyond the pleading stage—has its foundation in section 19A of the agreement, which entitled Barwin to the highest level of benefits that "are enjoyed" by department heads and similar employees "by practice." Barwin asserts that it was the Village's practice to allow senior-level employees to purchase out-of-state pension credits, and that consequently, it was his reasonable expectation that he would be permitted to do so in the event he needed such credits in order to reach the 8-year vesting threshold. Yet, when the Village forced him to resign, it departed from that practice and effectively refused his request to purchase pension credits. That decision, he asserts, was taken with malice to specifically deprive him of a right that other employees, including

a prior Village Manager, had been granted by practice, in breach of the implied duty of good faith and fair dealing.

We review the district court's decision to grant summary judgment to the Village on this claim *de novo. E.g., Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). Summary judgment is properly granted to the moving party when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Stockton*, 44 F.4th at 614. In assessing the evidentiary record underlying the district court's decision, we grant the non-moving party the benefit of conflicting evidence and any reasonable inferences that may be drawn from the evidence. *Id.* We shall affirm the district court's summary-judgment decision in this case so long as no reasonable finder of fact could conclude that there was a practice of allowing senior Oak Park employees to purchase out-of-state pension credits. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986); *Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 441 (7th Cir. 2021).

As relevant here, section 19A entitled Barwin to the highest level of benefits that "are enjoyed" by department heads and like employees "by practice." So there are two inter-related questions presented: (1) was there a practice of allowing senior employees to purchase out-of-state pension credits, and (2) was the practice sufficiently current, such that it would have been recognized as one as continuing or precedential, so to speak, at the time of Barwin's hiring and during his tenure as a Village employee.

There are multiple undisputed facts that are relevant to these questions: (1) As set forth in the Second Amended Complaint (the factual allegations of which the Village has

admitted as true), Village President Pope told Barwin that his immediate predecessor had purchased pension credits; (2) a total of five Village employees in the decades preceding Barwin's hiring had asked to purchase pension credits and were permitted to do so; (3) so far as the record reveals, no such previous request was ever denied; (4) apparently, the last time such a request was made was in 2001, some five years before Barwin was hired (that request was made by Barwin's predecessor) and some 11 years before he was forced to resign; and (5) no request to purchase an out-of-state pension credit was made between the time Barwin was hired as Village Manager and the time he was advised to resign or face termination.[16]

As we have noted, the district court was not convinced that a total of five requests, made over a period of decades, was sufficient to constitute a practice, *i.e.*, a customary or usual way of doing something. The court also reasoned that the "are enjoyed" language of section 19A referred to benefits that are *currently* enjoyed by employees, and that the five-year time gap between the last time a request to purchase pension

---

[16] A printout from the Illinois Municipal Retirement Fund's database indicates that a total of 12 Oak Park employees submitted applications to purchase out-of-state pension credits from 1990 to 2019. R. 125-6 at 4. One of the 12 applications was submitted by Barwin himself in 2012 and there was one subsequent application submitted by another Village employee in 2019. Thus, a total of 10 applications were filed in the 22 years prior to Barwin's resignation. Apart from knowing that five of those 10 applications were granted, we do not know what happened with the other five. Some number of those applications may have been granted. *See* n.2, *supra.* As noted previously, it is undisputed that no such application—apart from Barwin's—was ever denied by a vote of the Village Board of Trustees or, as in this case, a refusal to submit the request to the Board. We can only assume that the other applications were withdrawn or not acted upon because the applicants chose not to pursue them.

credits had been granted in 2001 and Barwin's hiring, and the passage of 11 years between that last prior purchase and Barwin's forced resignation in 2012, was too great to establish a right that was enjoyed by employees at the time of his hiring and/or ouster.

Looking at the alleged practice in context, however, we conclude that it would be possible for the factfinder to resolve these points in Barwin's favor and find that there was a practice of allowing senior Village employees to purchase out-of-state pension credits. For that reason, it was error to enter summary judgment against Barwin on this claim.

The contract itself does not define the term "practice," and the parties' briefs do not point us to any informative precedents on the matter; but as it happens, the question comes up regularly in labor arbitration. Workplace practices or "the law of the shop" can shed light on the meaning of ambiguous terms in a collective bargaining agreement and, in appropriate cases, supplement the written agreement with implied but nonetheless binding terms. *See United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581–82, 80 S. Ct. 1347, 1352 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry, and the shop—is equally a part of the collective bargaining agreement although not expressed in it."); *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 413–14 (7th Cir. 2021) ("any well established practices that constitute a course of dealing between the [rail] carrier and employees form part of the agreement the same as do any specific terms set out in the text of the agreement") (cleaned up); *Bhd. of Maint. of Way Employees Div./IBT v. Norfolk So. Ry. Co.*, 745 F.3d 808, 813 (7th Cir. 2014)

("An employer's contractual claim may rely upon implied contractual terms, which the parties established through past practices."). Arbitrators are thus frequently called upon to decide what constitutes a practice (or "past practice," as it is often referred to) for this purpose. In this case, of course, section 19A of the agreement not only invites but requires the court to consider what benefits the Village had established for senior employees via practice. *See* Carlton J. Snow, *Contract Interpretation: The Plain Meaning Rule in Labor Arbitration*, 55 FORDHAM L. REV. 681, 695 n.95 (1987) ("The most familiar way to incorporate past practices into a contract by reference is through a so-called 'past practices' clause or a 'freeze' or 'maintenance of benefits' clause.") (quoting *Moore Co. v. Directly Affiliated Local Union No. 22804*, 79-2 Lab. Arb. Awards (CCH) ¶ 8337, at 4410 (Bornstein, Arb., 1979)).

Of course, Barwin was not a union member and his employment was not subject to a collective bargaining agreement. But his employment agreement expressly granted him the benefit of rights that comparable Village employees enjoyed as a matter of practice, and so we take guidance from these cases as to the criteria that inform whether a particular practice can be recognized.

"Something qualifies as a practice if it is shown to be the understood and accepted way of doing things over an extended period of time." Richard Mittenhall, *Past Practice & the Admin. of Collective Bargaining Agreements*, 59 MICH. L. REV. 1017, 1019 (1961). Criteria that arbitrators look to in assessing whether prior actions amount to a practice include clarity and consistency, longevity and repetition, acceptability (*i.e.*, the parties are aware of the practice and regard it as the correct and customary way of handling the particular issue or

circumstance), and mutuality (*i.e.*, it is the product of a joint understanding between the parties). *Id.*; *see also* Kenneth May, ed., *Elkouri & Elkouri*, HOW ARBITRATION WORKS, ch. 12.2 at 12–4 (8th ed. 2016) (quoting *Celanese Corp. of Am.*, 24 LA 168, 172 (Justin, Arb.,1954) (a past practice generally must be "(1) unequivocal, (2) clearly enunciated and acted upon, [and] (3) readily ascertainable over a reasonable period of time as a fixed[ ] and established practice accepted by both [p]arties")). Single, isolated, or sporadic incidents are typically rejected as insufficient to establish a past practice. *See id.* at 12–15 & n.23 (collecting cases); Mittenhall, at 1019. However, a limited number of instances may nonetheless be deemed sufficient to establish a practice when the relevant situation to which the purported practice applies occurs only on occasion. *See, e.g., In re arbitration between Grievant 1 and Respondent 1 (Servs., Not Elsewhere Classified)*, 2019 WL 3766458, at *7 (Perea, Arb., May 20, 2019) ("It may be argued the before-mentioned instances when National Days of Mourning as proclaimed by the President were treated by the parties as 'holidays' … are too infrequent to constitute a valid past practice. It must be noted, however, that the death of a United States President is not a matter which occurs with frequency. … Where the incidents giving rise to the issue of binding past practice are found to be infrequent, as in this instance, the gauge for measuring the repetition of such occurrences must be adjusted accordingly."); *In re Earthgrains Co. (Marquette, Mich.) & RWDSU, Local 665*, 2007 WL 8319142, at *7 (Roumell, Jr., Arb., Jan. 22, 2007) ("This Arbitrator appreciates, as suggested by the Union's advocate, that a 'past practice' means a long-standing practice that is frequently recognized and mutually adopted by the parties. The suggestion was that the examples used were too infrequent to arise to a standard of a binding past

practice. Yet, the fact is, when a conversion of a full-time to a part-time position did occur, it was not challenged by the Union. As Arbitrator Brodsky in *Monroe County Intermediate School District*, 105 LA [565] (1995) at 567, observed: '[A] practice can be established if, when one circumstance occurs, it is consistently treated in a certain way. The occurrence need not be daily or weekly, or even yearly. But when it happens, a given response to that occurrence always follows.'") (additional citation omitted); *In re Bi-State Dev. Agency of the Missouri-Illinois Metro. Dist. (Transit Div.) & IBEW, Local* 2, 2004 WL 6344102, at *11 (Block, Arb. Apr. 8, 2004) ("I find merit in the Agency's position that a past practice can be found in a consistent response to a situation that occurs infrequently. The record establishes that, for these parties, in every situation when the Agency determined that it was necessary that electricians work a shift other than their bid shift, it was handled by requesting volunteers to work the shift with the time-and-one-half compensation for the first day."); *In re arbitration between Respondent & Grievant-1, Labor Union (Elec. Gas & Sanitary Servs.)*, 2000 WL 36095728, at *12 (Keenan, Arb., Apr. 20, 2000) ("[W]ith respect to the Union's task of establishing a past practice of a limit on management's prerogatives vis-à-vis assigning the task of unloading unexpected incoming trucks, it gets some assistance from the arbitral principle to the effect that fewer instances are required to establish a 'practice' where the situation (as here) arises only infrequently.") (but ultimately concluding evidence insufficiently specific to establish alleged practice); *In re Nat'l Coop. Refinery Assoc., McPherson, Kan., & Oil, Chem. & Atomic Workers Local 5-558*, 1997 WL 34982504, at *3 (Allen, Jr., Arb., Oct. 1, 1997) ("this is a 'classic' case wherein contract language has been modified via a very long and consistent past practice, even though this

situation arises relatively infrequently"). Thus, in appropriate circumstances, arbitrators have determined that a past practice exists even when only a handful of instances are cited as evidence of that practice.

In reviewing the district court's summary-judgment decision in this case, we must ask whether a factfinder reasonably could find that there was a practice of allowing senior Village employees to purchase out-of-state pension credits when there were only five precedents identified over a period of multiple decades. That is a small number of priors, we agree, but as the foregoing cases reveal, it matters to the determination how frequently the underlying circumstance occurs. Oak Park is a mid-sized municipality with just under 52,000 residents as of the 2010 census, *see* U.S. Census Bureau, Quick Facts, Oak Park Village, Illinois, https://www.census.gov/quickfacts/oakparkvillageillinois, and has a total workforce of roughly 350 municipal employees, *see* "About Oak Park's Municipal Government," https://www.oak-park.us/your-government/village-manager/about-oak-parks-municipal-government.[17] We do not know how many people in that workforce qualify as department heads or their equivalent, but whatever the number might be, it is necessarily a modest portion of the Village workforce. The number among that group who have had out-of-state work experience and have sought to purchase out-of-state pension credits would logically be even smaller. What we know, however, based on Barwin's investigation is that in the two decades or so prior to his forced resignation, five individuals had sought to purchase out-of-

---

[17] The record indicates that the Village workforce was reduced substantially during Barwin's tenure owing to the Great Recession and its fiscal fallout for the Village. Barwin Dep. Aug. 11, 2020 at 41, R. 125-4 at 17.

state pension credits and all five were granted their requests by the Village; no such request had been denied. *See* n.5, *supra*. In sum, the relevant instances applied to a relatively small group of Village employees, occurred only occasionally, and were all resolved the same way. We cannot say as a matter of law this was insufficient to constitute a practice for purposes of section 19A.

The district court and the Village have placed emphasis on the current tense of the "are enjoyed" language of section 19A. It is true that the provision is phrased in the present tense, and we presume that the parties chose that tense deliberately. The language reasonably suggests, we agree, that the parties intended to exclude practices that the Village had abandoned or modified and to include only those workplace practices that were still understood to represent the Village's way of handling particular benefit issues at the time Barwin was hired and during his tenure.

As to benefits that are issued, applied for, or adjudicated frequently, drawing a line between prior and current practices may be a relatively straightforward matter. How the Village handled various types of leave requests (*e.g.*, sick, parental, family, or personal leave) five years ago may be inconsistent with how such leave requests are handled today, and to that extent, contract language referencing benefits that "are enjoyed" by practice would tend to exclude the former in favor of the latter.

But as to benefit questions that come up only infrequently, a rigid focus on the day the employee is hired or even the duration of his tenure as an employee may not be appropriate. Suppose, for example, that a particular issue of employment benefits for senior employees comes up, on average, once in

five years (taking extended parental leave, for example), but the evidence nonetheless establishes that it has been handled in a particular way and there is a shared, ongoing understanding between the employer and its workers that that is how the matter has been and should be handled. Suppose further that at the time of the plaintiff's hiring, it had been five years since the issue last arose. Does it necessarily follow that the passage of time *alone* precludes a factfinder from determining that there was a practice in effect at the time of the plaintiff's hire? Likewise, does the fact that the issue happens not to come up during the plaintiff's multi-year tenure as an employee preclude the factfinder from concluding that a previously-recognized practice had not been abandoned and remained in effect? We think the answer to these questions is "No."

Certainly, workplace routines evolve, the circumstances that inform them can change, and prior practices can be abandoned; whether or not that was true here presents a question for the factfinder. The passage of time certainly allows an employer to argue to a factfinder that what it did in the past no longer represents current practice, just as the limited number of prior occurrences permits it to argue that, in fact, there never was a recognized practice as to a particular benefit. But as the line of labor cases we have cited makes clear, when the relevant circumstance occurs only infrequently, one cannot draw hard lines about what is a practice—or what constitutes a current practice—based solely on the number of prior precedents or the passage of time between or following those precedents. Again, having in mind that the pool of eligible employees in this case was small and that the issue would come up only infrequently, the fact that the last occasion on which a request to purchase credits had occurred five years prior to Barwin's employment does not strike us as foreclosing the

notion of an ongoing practice, particularly when Barwin's predecessor in the Village Manager position himself had benefitted from the practice. Indeed, a factfinder might construe the fact that Village President Pope referred to that very instance at the time of Barwin's hiring (more on that in a moment) as an affirmation that the practice indeed was an ongoing one.

More generally, notwithstanding the present tense of the "are enjoyed" phrasing, section 19A refers to benefits that are enjoyed "by practice." What occurs as a matter of "practice" is inevitably and necessarily backward-looking to some degree. *Cf. Star Tribune Co. v. Minn. Newspaper Guild Typographical Union*, 450 F.3d 345, 349 (8th Cir. 2006) ("The CBA did not define *present practice* [as used in the agreement's preamble] and the arbitrator therefore had to look at extrinsic evidence to inform his interpretation, including an examination of the past practices of the parties to the agreement.") (emphasis ours) (applying federal law). The parties themselves concur on this point, as is evident from the district court's decision, which noted that both parties embraced a definition of the term "practice" that, among other things, "looks back at what has been done and whether it has been done consistently." R. 145 at 9. This reinforces the notion that one must necessarily look backward in time to identify whether there has been a "practice," notwithstanding the current-facing "are enjoyed" language of the contract. The use of one term that looks to the past and a second clause that focuses on the present is not inconsistent: "practice" focuses on what has consistently been done in the past, whereas "are enjoyed" reflects an expectation that this past practice remains valid, *i.e.*, that nothing has interceded to render a past practice no longer binding.

Again, notwithstanding the relatively small number of prior events in question (five), given the fact that these requests were all resolved favorably to the employees, the fact that the plaintiff's immediate predecessor was permitted to purchase credits, and the fact that the Village President emphasized to Barwin at the time of his hiring that his immediate predecessor had been permitted to purchase such credits, the record would support a finding that there was a practice of granting such requests that was sufficiently ongoing (*i.e.*, current) at the time of Barwin's hiring. So Barwin is entitled to present his case on this claim to a factfinder.

A word is in order about Pope's representation to Barwin regarding his predecessor's purchase of out-of-state pension credits. The district court believed it was foreclosed from considering any such statements by the employment agreement's integration clause, which provides that "[a]ny prior discussions or representations by or between the Employer and the Employee not specifically stated in this Agreement are rendered null and void by this Agreement." R. 44-1 at 8, § 21A. We agree that this clause excludes evidence of Pope's assurance that Barwin would be permitted to purchase pension credits if needed: that was a promise that was not set forth in the agreement itself. But we do not understand this clause to preclude consideration of Pope's additional statements to Barwin as evidence of the very sort of "practice" that section 19A of the contract explicitly incorporates.

When the terms of a contract are clear, an integration clause in conjunction with the parol evidence rule heeds the four corners of the parties' agreement and avoids misunderstandings that may arise from extrinsic evidence of what the parties may have talked about, contemplated, understood, or

intended yet failed to memorialize in writing. *See Air Safety, Inc. v. Tchrs Realty Corp.*, 706 N.E.2d 882 (Ill. 1999).

But when, for example, contract language is ambiguous, parol evidence properly may be admitted to resolve the ambiguity notwithstanding the contract's integration clause. *Id.* at 884–85; *see Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (en banc) (lead opinion) (federal law); *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 630 (7th Cir. 2004); *Brooklyn Bagel Bros., Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 380 (7th Cir. 2000); *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 440 (7th Cir. 1998) (federal law). Likewise, in the past-practices labor cases that we have identified, parol evidence is routinely admitted to establish the existence and nature of past practices in a particular workplace. Logically, unless an agreement itself names and delineates the contours of a given practice, extrinsic evidence is the only way a practice *can* be identified. Judicial decisions reviewing arbitral awards in turn recognize that when the arbitrator has turned to extrinsic evidence to ascertain whether there is a past practice in order to cast light on ambiguities or gaps in the parties' written contract, he or she is nonetheless interpreting their agreement. *See Jasper Cabinet Co. v. United Steelworkers of Am., AFL-CIO-CLC, Upholstery & Allied Div.*, 77 F.3d 1025, 1030 (7th Cir. 1996) (in effort to resolve ambiguity of contract language regarding overtime work, arbitrator's "comprehensive analysis" resorting to extrinsic evidence including, *inter alia*, "circumstantial evidence relating to the practices of the Employer which clearly demonstrate its lack of belief that overtime was mandatory" confirmed that "the arbitrator was engaged in interpretation of the agreement") (federal law); *Graphic Packaging Int'l, Inc. v. Graphic Commc'n Conf. Int'l Bhd. of Teamsters, Dist. Council 1, Local 77-P*, 2010 WL 3699981, at *3 (E.D. Wis.

Sept. 13, 2010) ("[T]he fact that the arbitrator relied on extrinsic evidence does not mean the award did not draw its essence from the agreement. … This was not a case of the arbitrator imposing his own world view or his 'notions of industrial justice' on the parties; the arbitrator was looking to past practice to give meaning to a provision he found ambiguous.") (federal law); *see also, e.g., United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC, USW Local 200 v. Wise Alloys, LLC*, 807 F.3d 1258, 1274 (11th Cir. 2015) ("the presence of a zipper clause [in the CBA] does not defeat the traditional rule that ambiguities can be resolved by looking to extrinsic evidence[,]" of past practices) (federal law).

By explicitly incorporating any rights that senior employees enjoyed as a matter of practice, the employment agreement opened the door to appropriate evidence of what such practices were. Pope's statements as to what the Village had done in the past with respect to requests to purchase out-of-state pension credits are admissible not only because they are relevant to whether there was a past practice concerning the purchase of such credits, but also because, if there was such a past practice, they could be construed as bringing that practice "up-to-date" as of the time of Barwin's hiring. That is, when Barwin specifically inquired about the point, Pope described what the Village's practice was: Pope was effectively describing it as an ongoing, current, practice (or so a factfinder might conclude). The timing of these remarks strike us as particularly important vis-à-vis the "are enjoyed" clause of section 19A, because this is when the terms of Barwin's employment were being struck and Pope, as President and a member of the Board of Trustees, was in a position to know

what the practice, if any, with respect to out-of-state pension credits was.

The integration clause should not block consideration of Pope's statements as to what the Village had done in the past, because properly understood, Barwin is not relying upon these statements as an enforceable promise—he is relying on section 19A for that. What he is relying on Pope's statements for is evidence of what the practice (enforceable through section 19A) was with regard to the purchase of out-of-state pension credits. Construing the integration clause to exclude Pope's statements to Barwin, when the contract otherwise requires parol evidence as to the existence of Village benefit practices, and when Pope was a logical source of evidence as to the nature of such practices, would be nonsensical. To be clear, we are not suggesting that Pope's statements were necessarily binding or authoritative as to whether there was such a practice and, if so, what the practice was; his statements are merely one piece of evidence on this point, and nothing precludes the parties from offering other relevant evidence on this point.

Even if we are wrong as to the admissibility of Pope's statements, wholly apart from those statements we have Barwin's representation that he independently looked into and confirmed what Pope told him about his predecessor and what the Village had done with respect to other pension-credit requests. That allegation is in the Second Amended Complaint and has been admitted by the Village. R. 94 at 1–2 ¶ 2, 8–9 ¶ 21. The exclusion of Pope's statements would therefore not deprive Barwin's case of evidentiary support on this point.

Finally, although the Village makes the point that all five prior requests to purchase pension credits were made by individuals who were, at the time of their requests, current as opposed to former employees, we do not view this as a material distinction. Barwin made the request for the same reason that all prior employees did, *i.e.*, to get himself to the vesting threshold, and although his decision to resign preceded his request to purchase credits, Barwin has pointed out that he technically was still a Village employee at the time he made this request. Barwin Aff. ¶ 4, R. 141-2 at 2. We add that the Village gives us no reason to believe that the imminence of Barwin's departure would have had any impact on the Village Board's ability to consider and act on his request or the IMRF's ability to credit him for his prior, out-of-state service.

In sum, the facts would permit a factfinder to conclude that there was a practice, current as of the time of Barwin's hiring, of granting senior employees the right to purchase out-of-state pension credits upon request. To be clear, although we view the evidence as being sufficient to support a finding in Barwin's favor on this point, it does not compel such a finding. Whether a practice exists is a case-by-case determination dependent on the totality of the circumstances and the inferences and conclusions the factfinder draws from those circumstances. A factfinder might find that a practice existed for the reasons we have noted, but it also might reach a contrary conclusion, perhaps because it deems the prior number of pension-credit approvals to be too few to support a true practice, *see Elkouri & Elkouri*, , ch. 12.2 at 12-5 n.23 (collecting examples of such cases), perhaps because it finds the passage of time since the last approval prior to Barwin's hiring and ouster suggests any past practice was now moribund, or because it views the prior approvals as merely representing

the unilateral, benevolent exercise of managerial discretion by the Village President and Board as opposed to a mutually-recognized understanding as to how the matter should be handled, *see id.* at 12-5 n. 21 (collecting cases citing managerial discretion); *see also Sperry Rand Corp.*, 54 L.A. 48, 52 (Volz, 1971) (distinguishing leniency by individual supervisors from mutual agreement or acquiescence by the contracting parties in a consistent course of action).

The district court thought that recognizing such a practice, and a determination that Barwin was entitled to purchase out-of-state pension credits consistent with that practice, would be inconsistent with "the spirit if not the letter" of the principle recognized in *Grassini v. DuPage Township.* that it would be "contrary to the effective administration of a political subdivision to allow elected officials to tie the hands of their successors with respect to decisions regarding the welfare of the subdivision." 665 N.E.2d at 864 (citing *Milliken v. Edgar Cnty.*, 32 N.E. 493 (Ill. 1892)); R. 145 at 10. Typically, cases in this line of authority deal with multi-year employment contracts, but the same rationale has been applied to other types of contractual undertakings as well. *See M.R. Deyo v. Comm'r of Highways of Sheridan*, 256 Ill. App. 3, 1930 WL 2992 (Ill. App. Ct. 1930) (multi-year installment contract for purchase of tractor). We understand the Village's position on this point to be that the votes of prior Village Boards of Trustees to approve the purchase of out-of-state pension credits cannot bind later Boards to vote the same way, and to the extent that section 19A of Barwin's employment contract represents that it does so, it violates the *Grassini* principle. R. 142 at 6.

We disagree. The Village entered into an agreement with Barwin that expressly granted him the highest level of

benefits that "are enjoyed" by other senior employees "by practice," which as discussed necessarily looks to what has been done customarily in the past, whether by the Board or other Village officials. Recognizing that practice in the agreement did not tie the Village's hands in perpetuity. We presume that if the Village wanted to disclaim any past practice and announce that it would no longer be followed going forward, it could have done so at any time (thereby terminating the requisite mutual understanding between the Village and its senior employees as to the practice) and yet there is no evidence that it ever did so as to the purchase of pension credits. For that matter, given that Barwin was an at-will employee, the Village could have insisted that the written employment agreement be modified to disclaim this or any other prior practice and sent Barwin packing if he did not consent. (As Barwin has noted, the terms of his employment had been modified on other occasions.) But the Village did not do that either. We can therefore infer that the members of the Village Board in office at the time of Barwin's discharge had accepted the provisions of his contract and the employee-benefit practices it incorporates via section 19A. *See Hostrop v. Bd. of Jr. Coll. Dist. No. 515*, 523 F.2d 569, 574 (7th Cir. 1975) (rejecting argument that plaintiff's original and superseding employment contracts with school district were void *ab initio* because, *inter alia*, they were contrary to principle that one school board should not be permitted to enter into contract that extends beyond election of successor board, noting that "the new board did not object to plaintiff's new contract [which extended two years beyond term of old board] and permitted him, on July 1, 1970, to commence serving under it," thereby adopting the contract); *Vill. of Oak Lawn v. Faber*, 880 N.E.2d 659, 672 (Ill. App. Ct. 2007) ("[T]he problem with contracting

beyond the term of the existing governing body is that the new body will be unable to make the decisions and use the discretion for which it was elected. This problem was never a risk under the [employment] agreements in this case because Faber was always terminable at will; neither the outgoing board nor the new board was ever in a position where it had to employ Faber against its better judgment."). The *Grassini* principle does not come into play here.

Finally, we note that Barwin repeats the argument he made below that because the district court had denied the Village's motion to dismiss the Second Amended Complaint based on alleged facts that the court deemed sufficient to state a plausible claim for breach of the covenant of good faith and fair dealing, and because the Village subsequently admitted the truth of those facts by failing to timely answer the complaint, the court was obligated to deny the Village's motion for summary judgment on the same rationale. Given our decision to reverse the district court's grant of summary judgment to the Village on other grounds, we need not reach this argument.

## III.

For the reasons set forth above, we affirm the district court's dismissal of Barwin's claim that the Village breached its duty of good faith and fair dealing when it forced him to resign in order to prevent his pension rights from vesting. However, we reverse the court's grant of summary judgment in favor of the Village on the claim that the Village breached the duty of good faith and fair dealing by refusing to approve his request, at the time of his resignation, to purchase out-of-

state pension credits. We remand that claim to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.